GRANT S. YOUMANS v. LOUIS B. HANNA, Andrew Miller, Thomas Hall, S. G. Severtson, Robert E. Barron, Henry E. Byorum, S. J. Rasmussen, James Johnson, George A. McGee, and Dank C. Greenleaf.

(160 N. W. 705.)

**Resident attorney of record — stipulation in writing — cause — calendar — advancing on — consent to — supreme court — setting aside — on affidavit based on belief — will not be — authority of attorney — time for preparation.**

1. Where the only resident attorney and attorney of record in a lawsuit signs and consents to the filing of a stipulation advancing the cause upon the calendar of the supreme court and setting it for hearing upon a day certain, such stipulation will not be set aside upon an affidavit by him merely to the effect that "he believes" he had no authority to sign the same, and that "he is informed" his nonresident associate counsel would be engaged and unable to prepare the brief, when the facts as to authority and engagements are clearly matters of positive knowledge to his client, and such nonresident counsel, and these persons themselves furnish no proof or affidavits whatever of the facts alleged, and when the court is satisfied that counsel had abundant time for preparation.

**Nonresident counsel — practice — courts of North Dakota — not permitted — as matter of right — permission — courtesy — privilege.**

2. Nonresident counsel are not permitted to practice in the courts of North Dakota as a matter of right, but as a matter of permission and privilege merely.

**State banking board — objectionable securities — should order them removed — depositors — safety of — considered.**

3. It is the duty of a state banking board to require a bank to remove objectionable securities where, in its opinion, the safety of the depositors requires it.

**State board — action of — justification — members — motives — immaterial — public duty — performance of — no liability for.**

4. Where such board takes such an action and is justified by the facts in doing so, the motives of its members are immaterial, since no liability can be based upon the performance of a clear and positive public and official duty.

**State board — action of — banker — grievance — objectionable securities — order to remove them from bank — courts — application to — relief.**

5. If a banker feels aggrieved at the action of the State Banking Board in requiring him to remove objectionable securities, he should apply to the courts to have such order set aside under the provisions of ¶ 3, § 5146, Comp. Laws, 1913. Unless this is done such order will remain in force and be effective.

**Lawful act — nuisance — harmful — banking stock — purchase of — by a number of persons — joining together.**

6. Except where the members engaged make what would otherwise be a lawful and innocent act a nuisance and harmful, what one may do singly a number may do together. The mere fact that a number of persons join together in making a purchase of banking stock upon terms and conditions which would have been perfectly lawful for one to do by himself does not render such transaction unlawful.

**Conspiracy — gist of action — damages — maintenance of.**

7. The gist of the action of conspiracy is damage, and where no damage is proved the action cannot be maintained.

**State banking board — order of — removing objectionable securities — failure to comply — closing bank — lawful act.**

8. An order of the state banking board requiring the Savings Deposit Bank, of Minot, to remove objectionable securities, and closing the bank on account of the failure so to do, *held* to have been lawful and valid.

**Bank — controlling stock — purchase of — after bank has been closed — valid — lawful — transaction.**

9. The purchase of the controlling stock in the said bank by certain of the defendants after it had been closed *held* to have been a valid and legal transaction.

On Motion to Vacate Order Denying Rehearing.

(161 N. W. 797.)

**Supreme court — justices disqualified — district judges — called in to sit — are supreme court justices — for all purposes in case — power — authority.**

10. A judge of the district court who is called to sit in the place of a justice of the supreme court becomes, when he reports for duty and enters upon the discharge of his duties pursuant to such call, for all purposes in the case in which he is so called, a justice of the supreme court, and is vested with the same power and authority as though he had been regularly elected and qualified to fill the office of justice of the supreme court.

**District court judges — acting as supreme court justices — decisions of — same as though rendered by the supreme court justices elected — number of district judges so acting — consideration — entitled to same.**

11. A decision promulgated by district judges, so called, is the decision of the supreme court of North Dakota, and entitled to the same consideration as though it had been promulgated by a like number of regularly elected justices of the supreme court.

**Public — third persons — de facto officers — acts of — scope of assumed official authority — valid — same as acts of officers de jure — judicial officers — rule applies.**

12. So far as the public and third persons are concerned, the acts of officers *de facto*, performed by them within the scope of their assumed official authority, are generally as valid and binding as if they were the acts of officers *de jure*. And this rule applies with full force to judicial officers.

**Supreme court — de facto justices of — who are — circumstances.**

13. For the reasons stated in the opinion, it is *held*, that Justices Fisk, Burke, and Goss were unquestionably *de facto* justices of the supreme court of North Dakota during the month of December, 1916, and consequently their official, acts during that time were valid.

**Supreme court — final order of — in cause on appeal — remittitur — to lower court — judgment entered on therein — jurisdiction — supreme court has lost — recall — reinstatement of case — no such power — exception — fraud or mistake.**

14. When the supreme court has entered a final order in a cause brought there on appeal, and the remittitur has been transmitted to, and judgment entered thereon in, the court below, the supreme court loses jurisdiction to recall the remittitur and reinstate the cause, unless the order directing the issuance of the remittitur was based on fraud or mistake of fact.

Opinion filed December 2, 1916. Rehearing denied December 28, 1916.

Appeal from the District Court of Ward County, *W. J. Kneeshaw,* Special Judge.

Action of conspiracy.

Judgment for defendants. Plaintiff appeals.

Affirmed.

Statement of facts by BRUCE, J.

This is an appeal from a judgment of the district court of Ward county which was rendered for the defendants on a directed verdict.

The amended complaint was as follows:

The plaintiff, appellant herein, in his complaint in this action, asserts and states with other facts that:

1. Heretofore and during the year 1909, the plaintiff, Grant S. Youmans, organized and established the Savings Deposit Bank of Minot, North Dakota. The said bank was incorporated under the laws of North Dakota with a capital stock of $35,000, all of which was paid

35 N. D.—31.

for and owned by the plaintiff, with the exception of twenty shares, ten shares of which were issued to George A. McGee. License and lawful authority to operate as a bank was duly issued to said Savings Deposit Bank by the state of North Dakota in the year 1909, and the plaintiff as the owner of the majority stock and executive officer of said bank operated it as a going concern continuously from the date of its organization up to and until the said bank was closed by the defendants, and the ownership of the three hundred thirty shares of stock of said bank were taken from the plaintiff in the month of October, 1913, in the manner and by the scheme, device, and conspiracy hereinafter more specifically set forth.

2. In the year 1913, when the events described herein took place, the defendant L. B. Hanna was governor, the defendant Thomas Hall was secretary of state, the defendant Andrew Miller was attorney general, and the defendant S. G. Severtson was chief examiner of banks, all of the state of North Dakota, and by virtue of their said respective offices the defendants Hanna, Hall, and Miller constituted the state banking board of that state, and the defendant Severtson was secretary of said board.

3. During this period, and when the conspiracy to ruin plaintiff and take said Savings Deposit Bank away from him was made and carried out, and during the year 1913, the defendant Robert E. Barron was the cashier, the defendant Henry E. Byorum was the assistant cashier, the defendant James Johnson was the vice president, and the defendant S. J. Rasmusson was the general utility man, political agent, and go-between of the Second National Bank of Minot, North Dakota. During the same time the defendant D. C. Greenleaf was the agent in the Commercial Club of Minot of the political machinery of the said defendants in office, and the agent of the large employers of labor in said Minot, North Dakota. Each of these interests were at that time involved in the labor troubles in which the defendant bankers also participated, as parties to said conspiracy.

4. At the time of the assault upon the plaintiff and the taking of his bank as hereinafter more specifically set forth, the defendant George A. McGee was plaintiff's attorney, and the plaintiff had no knowledge of said McGee's perfidy and betrayal until after the consummation of said

conspiracy in which said McGee also participated, as set out in detail herein.

5. The defendants' hostility to plaintiff had inception in the envy and greed of the defendant bankers, who resented plaintiff's fairness and generosity in paying his depositors 5 per cent per annum interest on their deposits, which the prevailing rates of interest at that time and place justified. The envy and hostility on the part of the rival bankers was intensified and spread to all of the defendants in summer of 1912 on account of the plaintiff's sympathy for the down-trodden toilers who were attempting to protect themselves by organization into labor unions, and on account of his efforts in behalf of the right of free speech, in both of which regards plaintiff encountered then and there the determined and bitter opposition of the defendants and each of them in manner and form as narrated in the following paragraph of this complaint.

6. In the spring and summer of 1913 there were many unemployed men in said city of Minot, and general industrial depression as the result of the ruthless manner in which the producers of North Dakota had been exploited by transportation companies as well as by monopolies in control of their markets and market places and of the prices paid for farm products. Certain large contractors and employers of labor in said city of Minot and in the state of North Dakota generally sought to take advantage of the large number of unemployed laborers by depressing the wage scale and by heavier exactions upon their laborers; and to meet this further and unwarranted exploitation and oppression efforts were made to organize these common laborers for their self-protection. In these efforts meetings were held upon the public streets of Minot at which addresses were delivered and arguments made urging united effort and organization on the part of all toiling men. These addresses and arguments publicly made, and the impending projected union and organization of the laboring men of that section, aroused and stimulated the fear of the large contractors and employers of labor, and incurred the bitter hostility and opposition to the effort to organize the workers on the part of those defendants and others who were closely allied politically and financially with said contractors and large employing concerns; and in consequence stern and unlawful methods of repression were adopted in carrying out which the freedom of speech on the public

streets was denied, many of the laboring men and others sympathizing with them were arrested and thrown into jail, and a veritable reign of terror was inaugurated, in which there was much suffering and many starving men. Into these labor troubles of Minot plaintiff was by the resistless demands of his conscience drawn, and he felt impelled to help feed the hungry and release the imprisoned to the extent of his abilities. This humanity on the part of the plaintiff incurred the enmity and malignant hatred of all of the defendants, whose greedy instincts had been aroused and stimulated by the clash with labor, and who looked upon plaintiff, a man of means and a banker, as a traitor to their class and a menace to their coveted and sustained supremacy in the social order.

7. In consequence of the envy, enmity, and greed of the defendant bankers and the fear and hatred of the defendant politicians and office holders, occasioned and stimulated as above set forth, and as the expression thereof, the said defendants in October, 1913, confederated and conspired together and with each other and with others whose names are to plaintiff unknown, for the purpose of wrecking plaintiff's said bank and destroying plaintiff's reputation and influence as a banker and citizen; and in carrying out such unlawful purpose and conspiracy the defendants under color and pretense of public service and by the perversion and abuse of official power and office, but without authority of law, assaulted and took actual possession of said bank and its business, and drove plaintiff out of said bank and business into obscurity, humiliation, and disgrace, and devested plaintiff without right or cause of all of his property and his reputation as a banker.

8. The assault of the defendants upon the plaintiff and his said Savings Deposit Bank was made on or about the 18th day of October, 1913, and was sustained for several days and until plaintiff was driven out of possession of said bank and business, which at the same time was taken and held as their own by the defendants Barron, Byorum, Rasmussen, Johnson, and McGee, in the manner and by the deceits, frauds, threats, pretenses, and proceedings as follows, that is to say:—

On Saturday, October 18, 1913, at about 2:30 in the afternoon of said day, the defendant Severtson, pretending to act in his official capacity as chief bank examiner of North Dakota, and as secretary of the state banking board, but in truth and in fact acting as the agent and under

the directions of all of the defendants as conspirators for the ruin of the plaintiff and the looting of his bank, rushed into the private office of said bank, and peremptorily demanded to examine the loan papers and securities held by the bank. Glancing over a bundle of these loan papers hurriedly, he peremptorily and arbitrarily demanded that these loans to the extent of $20,000 should be taken out of the bank and $20,000 in cash put in before 9 o'clock Monday morning following. On the following day, Sunday, in the evening, plaintiff reported to said Severtson, who was at the time in said bank and still pretending to act as bank examiner, that he, the plaintiff, had good prospects of raising the $20,000 cash demanded on the following morning, whereupon the said Severtson peremptorily and arbitrarily increased his demand for cash from $20,000 to $48,000. This demand was outrageously unfair and unwarranted, and was made by said Severtson in deliberate bad faith, and was accompanied by repeated insinuations, in which all of the defendants later joined, that plaintiff had been operating said bank in an unlawful manner, and by divers suggestions that plaintiff had in some manner incurred severe criminal penalties on account of said loans, and by covert threats often repeated that plaintiff would be prosecuted and imprisoned unless these so-called excessive loans, aggregating some $48,000, were in some way lifted and retired as assets of said bank. These insinuations were false, and these suggestions were fraudulent, and were well known to be false and fraudulent by the defendants and each of them when they were made by them. The plaintiff had done nothing unlawful, and there was nothing fraudulent regarding said loans or any of them. They had been examined by said banking department and permitted to be carried as assets without objection for a period covered by several former examinations. The threats made by the said Severtson and the other defendants to prosecute the plaintiff were made to weaken and intimidate him into a realization that he was in their power and that they could and would take from him not only his bank and his reputation as a banker, but all his other property and his personal liberty as well unless he at once made satisfactory terms with them. These threats frightened plaintiff to a degree that rendered him incapable of successfully resisting defendant's demands that he must surrender without payment to the defendant McGee a note which the said McGee had given plaintiff in payment for ten shares of the capital stock of

said bank, and that he should turn over and yield all of his own and his wife's stock in said bank, being three hundred forty shares thereof, to the said defendant bankers, and give to them a bonus of $5,000 in addition.

9. On the following Monday, October 20, 1913, the plaintiff being unable to put the $48,000 of additional cash capital into said Savings Deposit Bank to satisfy the unlawful and fraudulent demands of the defendant Severtson pretending to act as chief examiner of North Dakota, the said Severtson and one of his deputies took actual physical possession of said bank and kept its doors closed, placing a sign on the front door reading as follows: "Bank closed; state examiner in charge." No steps were taken or contemplated by either the chief examiner or the state banking board for the appointment of a temporary receiver of said bank. No receivership or reorganization was needed to protect the depositors of said bank. The plaintiff offered and was prepared within any reasonable time to replace by cash any loan or security held by said bank that the chief examiner saw fit to condemn or question. The said examiner and each of the other defendants knew that said bank was solvent and capable of paying every depositor in full. The sole and only purpose of the said Severtson in closing said bank was to discredit and ruin plaintiff as a banker, and to compel him to yield possession and control of said bank and its assets to the defendants Barron, Byorum, Johnson, Rasmussen, and McGee, and to disarm plaintiff as a political force antagonistic to the defendants Hanna, Miller Hall, Severtson, and Greenleaf.

10. After possession of said Savings Deposit Bank was taken by defendant Severtson under cover of his office as chief bank examiner of North Dakota and under the false pretense of protecting depositors, the said Severtson for several days unlawfully held possession of said bank and all its assets, and conferred day by day with the other defendants, Barron, Byorum, Rasmussen, McGee, Johnson, Hanna, Miller, and Hall, to devise ways and means of stealing, under cover of legal methods, said bank from the plaintiff, and at the same time making him pay $5,000 for the privilege and benefit of being so robbed by them. While the said Severtson was thus without warrant of law in possession and control of said bank from October 18 to October 23, 1913, the state banking board and the members thereof, with full knowledge of

such possession and of all the facts, took no steps whatever to protect either the depositors or owners of said bank, but suffered and permitted the said Severtson and the other defendants, McGee, Barron, Byorum, Rasmussen, and Johnson, to despoil plaintiff by threats, demands, and frauds above described, and continued by their actions in unlawfully holding said bank to give color and support to said threats and demands.

11. After the plaintiff had been thus forced and intimidated by the defendants into the surrender of said bank and its business to the defendant bankers, and into the surrender to the said McGee of his note for $1,000, and into the payment of said $5,000 bonus, the defendants nevertheless for many days continued their slander, vituperation, and abuse of the plaintiff in an attempt to justify the looting of his bank and for the purpose of further weakening his social and political influence. In this campaign of slander and abuse which the defendants waged against plaintiff during their assault on said bank, from October 18 to October 23, 1913, and for some time thereafter, said defendants caused, permitted, and encouraged said Severtson and others to suggest and insinuate to the depositors of said bank and others in Minot and in Bismarck, North Dakota, that the plaintiff was dishonest, that he had tried to swindle said depositors, that he had been carrying illegal papers in its assets for the purpose of looting said Savings Deposit Bank, that he was a very dangerous man and should be driven from the community for the public welfare, although each and every one of these suggestions and insinuations were false and known by the defendants and each of them to be false at the time.

12. After the plaintiff had been coerced and driven into yielding reluctant consent to the so-called reorganization plans formulated and insisted upon by the defendants Barron, Byorum, Rasmussen, and McGee in conference and conspiracy with the defendant Severtson, and on October 23, 1913, submission of the entire matter was made by telephone to the defendants Hanna, Hall, and Miller as the state banking board, and they, without any sort of probe or investigation, hearing or proof, and without warrant or authority of law, conferred by telephone upon one B. J. Schoregge, then a deputy examiner at Minot, North Dakota, full authority to ratify the so-called reorganization and the taking over of said bank and all of its property by said defendant bankers. A pretended approval of the so-called reorganization was on

October 24, 1913, given by the said Schoregge by placing the defendants Barron, Byorum, Johnson, Rasmussen, and McGee in full charge and control and possession of said Savings Deposit Bank as stockholders, directors, and officers thereof, and plaintiff was thereby without consideration and unlawfully devested and shorn of all right, title, interest, and ownership of every nature and description in and to said bank, its assets, business, and good will, and no restitution or return has ever been made or offered to plaintiff therefor by the defendants or any of them.

13. At the time said Savings Deposit Bank and the ownership thereof was wrested from the plaintiff by the defendants as aforesaid, its assets, business, and good will as a going and growing concern were worth on a fair and reasonable valuation $100,000, and plaintiff was by said taking damaged in the amount of said sum.

14. The threats, insinuations, and abuse directed by the defendants against plaintiff while they were taking said bank away from plaintiff as aforesaid caused plaintiff to suffer great agony and distress of mind and impairment of health, and the shame, humiliation, and disgrace put upon plaintiff by defendants by the forcible and unlawful taking of the Savings Deposit Bank from plaintiff in the manner above described still rests upon plaintiff and retards him in every social, business, and political activity on which his life and happiness depend, to plaintiff's damage in the sum of $100,000.

15. The plaintiff paid the said defendants the sum of $5,000 as hereinbefore alleged, and was thereby damaged in said sum.

16. That all and singular the acts done and things performed in the carrying out of said conspiracy by said defendants was by said defendants made, done, and performed by them wilfully and maliciously, and with the intent and purpose of injuring the plaintiff herein.

The answers were general denials.

The instruction of the court which directed the verdict was as follows:—

"The court will instruct you as to that, that a banking board acting in a quasijudicial capacity, and having discretionary—the acts performed by them being partly discretionary and partly judicial; that under the law the banking board, or the members of such board are not liable in damages in this case as a matter of law, and I instruct you that,

in addition to that, we have a statute which provides as follows: Any and all orders made by such board shall be immediately operative and remain in full force until modified, amended, or annulled by such board, or by a court of competent jurisdiction, in an action to be commended by the party against whom such order may have been issued.

"Under that law the undisputed evidence showing that an order had been made, it is in full force or affect until modified by the board or annulled by a court of competent jurisdiction, and I instruct you that their remedy is to proceed under that statute, and they cannot attack that order at this time in a collateral proceeding such as this is; therefore so far as those four defendants are concerned there was absolutely no evidence in this case whatsoever, or no question of fact that would warrant you in finding a verdict against them.

"Now, then, on the question of the other defendants, it is contended by Mr. Youmans in this case, that the bank examiner went in there and gave him only until Monday morning to raise $48,000, but the bank examiner claims that it was only $25,000, and that talking of the $48,000, he merely gave a memorandum showing there was $48,000 of objectionable paper, but he did not require him to put back or take out $48,000, but merely $25,000. Of course, this is a question of fact, and, in my deciding it, it cuts no figure because if there is any question of fact to be decided by the jury I must submit to it—I have no right to take a case from the jury, if there is any question of fact submitted to them. I merely mention that for this reason, Mr. Youmans contends that the time was too short, that he should have been given a greater time, and it was unreasonable. If that is a fact he should have proceeded under the statute, and gone to court, and had that order set aside, obtained an injunction, and had further time to. But under his own evidence in this case, it shows that the time did not make any difference, because he admits on the stand in this case that he obtained sufficient money to pay off the depositors, or promise of it from his friends, but that he would not take it because he did not want to, because there might be further trouble or might embarrass his friends. The undisputed evidence in this case shows that on or about the 22d day of October this plaintiff entered into a contract with Mr. Barron and Mr. Rasmussen to sell the assets of that bank. The contract shows upon its face what it was. Now the court will further instruct you as a matter

of law that in his opinion there is no question of—there is no evidence in this case that would warrant finding that there was any duress in the obtaining of that contract. It was apparently voluntarily, and, in addition to that, the *undisputed evidence* in this case *shows a subsequent ratification.* But the court further instructs you that, even assuming for the purpose of this case—at least state to you, does not instruct you —that even for the purpose of assuming in this case that there was duress in the case, that he has signed that contract under duress, it would make no difference in this case, for the reason that the contract is there, which has never been set aside by any court, that this is a collateral attack in this case, and it cannot be passed upon in this case; that their remedy would be to set aside that contract in a proper proceeding for that purpose.

"Now, gentlemen of the jury, I cannot refrain from making a few remarks with reference to my coming here, and certain matters that transpired during the trial. I was invited to come here and preside in this case. I did not know at the time I came here what the case was. If I had known what the case was, I assure you I would never have been here. I have endeavored during the time I have been here to try the case honestly and fairly upon my part. It is my duty under the law and under my oath as a judge of this state to decide a case fairly and impartially on the law, and decide all question of law. I have attempted to do so. Lots of evidence has been stricken out and lots of evidence has been rejected, on proper objection. I did so believing that I was acting rightly under the law doing so. I believe I am right. If I were not, they have redress in the supreme court, and it is my fault if I made any mistake in that respect and it is not your fault.

"Now, there are many things that transpired here. I have seen some very disgraceful proceedings by the audience in this case, some things I have never seen in any court of justice before. It indicates to me that there are certain people in this audience—I don't know who they are—I don't know at the present time, but during the trial of this case, who must have perverted minds, people who would trample our beautiful flag of stars and stripes, men who are not entitled to live in any community, and I am ashamed of them.

"I have also heard remarks pass while I have been here, meaning that I have been unfair and unjust, that I have not given the plaintiff

a fair show. I have heard remarks of a certain person who stated that, that little judge, before Manahan gets through with him, he would be down on his knees to him, and remarks of that kind.

"Now, gentlemen of the jury, I have endeavored to do my duty as an American citizen honestly, faithfully, and justly in the sight of God, and I am not ashamed of anything that I have done at this trial.

"Another thing that has transpired and I desire as a matter of privilege to speak about it, and that is this, while walking down town today after dinner, I walked ahead of a couple of gentlemen whom I am sorry to say are attorneys in this case, and I heard certain remarks. I was with a gentleman who heard them at the same time, stating words to this effect: 'That we will have a meeting in the Opera House next Sunday, and it will be crowded to overflowing, and I will remain here until that time, and we will talk the case over from beginning to end, and we will show them how this case originated.' And the other person with him said, 'Yes, and they are going to have a meeting to-day, and we will do the same thing.' I want to say I am not afraid of them. I am not afraid of a living soul, I am not afraid of any anarchist in this court or this state, and I am prepared to do my duty, as I understand it under my oath, and in the presence of Almighty God. And they cannot bulldoze me or frighten me in any respect. I have no right under the law to usurp the functions of a jury. I have no right to pass upon any question of fact. I have a right to instruct the jury on questions of law, and it is their duty, under their oaths, to accept the law as given by me, and I state to you, gentlemen of the jury, that in my opinion the plaintiff has wholly failed to make a case, that there is no evidence or question of fact to be submitted to you, and I instruct you to find a verdict in favor of the defendants, and will ask one of the jurors to sign the verdict."

The remaining facts will, so far as is necessary, be given in the opinion.

*C. B. Davis, James Manahan,* and *Arthur Le Sueur,* for appellant.

*H. J. Linde,* Attorney General, Assistant Attorneys General, *Francis J. Murphy, H. R. Bitzing,* and *John E. Greene* (*Palda & Aaker,* and *W. E. Purcell,* of counsel,) for respondents.

Bruce, J. (after stating the facts as above). No appearance was made by counsel for the appellant on the oral argument, and although a so-called brief was filed, it is entitled to no consideration under the rules and practice of this court. There is no argument upon any of the errors sought to be assigned, nor are the specific objections to the rulings complained of stated, and rule 34 of this court is absolutely ignored. Such as it is, however, the brief contains 378 alleged assignments of error, such as the following: "The court erred in ruling found line 3, page 642, of the transcript," and in addition copies of the pleadings; a copy of the court's direction to the jury and the following paragraphs: "Reserving objection to the advancement of the hearing on this cause and to the limitation imposed for serving and filing briefs herein; still insisting that the order setting this cause for hearing on the merits out of its regular order on the calendar was improvidently made, in violation of the rules and practice of this court, and without authority, knowledge, or consent of appellant; and still protesting that it is a denial of justice and an unwarranted abuse of judicial discretion to impose the impossibility of reviewing the record in this case and discussing the legal points involved within the scant and insufficient time allowed, Grant S. Youmans, plaintiff and appellant, nevertheless, but without waving the foregoing objections and protest, submits these facts, points, exception, authorities, and considerations."

"The reasons assigned by the court for advancing this cause are without foundation either in fact or in law. There is no question of public policy involved, for the acts committed by the officials who are defendants in this action are not acts committed in the regular course of the performance of their duty, nor such as they perform in dealing with other banks, but were a special set of actions concocted for the specific purpose, as detailed in the complaint. No contentions are made in this action on the part of the respondents that similar action is either contemplated or advisable in dealing with other banks, and no contention is maintained by the appellant that the ordinary and usual procedure of the public examiner and the banking board in dealing with other banks is in any wise illegal. So that no procedure and no special construction of the law relating to other public institutions is contended for on either side in this cause. Furthermore, the action on the record as it stands was favorable to the banking board and its construction of the law, so that the public officials cannot contend they are laboring

under any difficulty by virtue of the pendency of this action. It is therefore manifest that no reason exists, either in law or in fact, why this cause should be advanced out of its regular place on the calendar. And it cannot be fairly submitted on the merits in advance of such position on the calendar."

There is, of course, no merit to this objection to the hearing of the case. There was in fact, no appearance of counsel; no motion for a continuance or attempt to have the former orders of this court set aside, but merely a protest. The protest even possesses no merit, and there is not and never has been any showing of a lack of ample time and opportunity for preparation.

The advancement was made because the case was of public interest and involved the conduct, duties, and responsibilities of the state banking board, upon the proper performance of which the safety of the savings and property of hundreds of thousands of depositors depends. But this is not all, it was advanced because counsel for the plaintiff solemnly stipulated that it should be advanced, and themselves stipulated the day on which it should be heard.

This stipulation was made on the 7th day of October, 1916, and was as follows:

In The Supreme Court,
State of North Dakota, September Term, 1916.

G. S. Youmans,

Plaintiff and Appellant,

vs

L. B. Hanna et al.,

Defendants and Respondents.

On defendant's motion to advance, the court having indicated a willingness to advance the above-entitled action, it is stipulated by counsel for the respective parties, in open court, that the case may be set for argument on November 10, 1916, at 10 o'clock in the forenoon.

C. B. Davis,

Attorney for Appellant.

John E. Greene,

Francis J. Murphy,

Dated Oct. 7, 1916.                    Attorneys for Respondents.

It is true that this stipulation was manually signed on the part of the plaintiff by his attorney, C. B. Davis, alone, and that the names of his nonresident counsel, Manahan and Le Sueur, were not signed thereto, but Davis was the only resident attorney and the only attorney of record. He was, in short, the only one of appellant's counsel who, except by courtesy and permission, was entitled to practise in the courts of this state at all; and, as far as the supreme court is concerned, no such permission or extension of courtesy has ever been requested. We are certainly justified in holding and believing that our own lawyers are attorneys and officers of this court, and not mere puppets, and in giving weight and credence to their acts and stipulations.

It is also true that afterwards an attempt was made to set aside this stipulation and to have the argument postponed until December 20, 1916. On this motion, however, the case *was postponed* until November 20, 1916, and even in the most extreme view of the case this postponement was certainly all that the plaintiff was entitled to. C. B. Davis, the only counsel of record for plaintiff and appellant, indeed had, in his affidavit when the case was first advanced and in his opposition to such advancement (and even this opposition was afterwards withdrawn and superseded by his written stipulation), merely claimed that his senior and *foreign* counsel would not be able to "start to prepare the brief prior to October 20th." When he later sought to set aside that stipulation, and on November 8, 1916, he expressly stated "that said brief is *under preparation,* but is not *wholly* prepared." The affidavit stated, and this merely on information and belief, "that his senior counsel, James Manahan, would be away from his office and otherwise engaged until the week of November 5th, and would be unable to prepare any brief in said cause." This court, however, again postponed the hearing until November 20th, and both it and counsel for respondents waived the necessity of printing the briefs. Surely this was all that any self-respecting lawyer could or should ask, and surely abundant time was given for preparation!

The motion to set aside the stipulation, indeed, bore much of the appearance of trifling with the court.

The motion was prepared not by the local attorney, and sole attorney of record, C. B. Davis, but by the senior counsel, James Manahan, him-

self, and it was mailed to this court, not from St. Paul, where the latter resides, but from Minot, North Dakota. The letter accompanying it was written on the letter head of the plaintiff, Grant S. Youmans, and the name of James Manahan was signed with a typewriter thereto. The affidavit of the local counsel, C. B. Davis (and the only affidavit therein contained), was evidently prepared by the said Manahan in St. Paul and was forwarded to the plaintiff, Youmans, at Minot, in order that the oath and signature of C. B. Davis might be obtained, and for transmission by the said Youmans to this court; for the envelope bears in its left upper-hand corner the words, "James Manahan, Pioneer Bldg., St. Paul, Minn." A telegram was also sent by the said Manahan to one of the judges of this court, which confirms this belief. Yet there is no affidavit except that of the said C. B. Davis, and as to the material facts he merely states that "he believes," "or is informed."

The only ground for setting aside the solemn stipulation of October 7, 1916, and which set the case for hearing on November 10, 1916, was the alleged lack of authority of the only attorney of record, and only resident attorney, and only attorney in the case who is, except by court-esy, allowed to appear in this court, and of the alleged engagements and inability to prepare the brief of the said Manahan. Yet Davis merely swore that "he believes he exceeded his authority," and "was informed" that Manahan was engaged, etc.

Some persons must have personally known whether Davis had this authority or whether he had not. These persons were the plaintiff, Youmans, and his nonresident counsel, James Manahan. Yet they make no affidavits. Manahan must have positively known whether he had been or was engaged or not. Yet no affidavit is forthcoming from him. On the question of authority also no facts are given in the affidavit of Davis. He merely says that he "believes" he did not possess it, and when the motion comes up for argument, neither he nor Manahan nor Youmans appear, and no opportunity is given to ask questions and to elicit the truth.

We cannot allow lawsuits to be played with in this way. Nor can we allow litigants to abuse the privilege (and it is after all merely a priv-ilege) of employing nonresident counsel to appear in our courts. Nor can we allow solemn stipulations to be set aside on mere conjecture and

alleged information when positive affidavits can be obtained from the parties who know the facts.

We set forth the affidavit of C. B. Davis, so that the situation may be clear to all. It is as follows:

State of North Dakota  }  ss.
County of Ward          }

C. B. Davis, being first duly sworn, says that he is the identical person who signed the stipulation on the above-entitled cause, consenting to the hearing of said cause by the court on November 10, 1916. That affiant believes that he exceeded his authority in signing said stipulation, and affiant further says that said stipulation was signed under a misapprehension of the facts. That affiant, after the signing of said stipulation, was informed that James Manahan, his associate counsel who was to prepare the brief in said cause, was under contract entered into before any order to show cause had been entered in said case, to do certain work which would take him away from his office all of the time, practically, until the week of November 5, 1916, and would be unable to prepare any brief in said cause, and did not and has not prepared such brief. That no order setting said cause for November 10th has been served on affiant, or on affiant's associate counsel, or on the appellant herein to the best of affiant's knowledge, information, and belief. That counsel Arthur Le Sueur is and for some days past has been engaged in the trial of a murder case in the state of Minnesota, and, as affiant has just been informed, will be unable to be present at said hearing. That affiant's employment in said case does not extend to the writing of the brief in said action, as the same was to be written by his associate counsel Manahan. That the appellant will be irreparably injured if he is compelled to go to the hearing of said cause before the court at this time, and that said brief is under preparation, but is not wholly prepared, and that appellant is wholly unprepared at this time to argue said cause to the court, by reason of the facts aforesaid.

Wherefore, the appellant prays: First, that he be relieved from the stipulation of said C. B. Davis; and, second, that said cause be replaced in its regular place on the December calendar of said supreme court,

or that the hearing thereof be continued until the 20th day of December, 1916.

(Signed)        C. B. Davis

Subscribed and sworn to before me this 8th day of November, 1916.

(Signed)        Jessie F. Shipton

Notary Public, State of N. Dak.

My commission expires Sep. 17, 1920.

This opinion, as so far written, practically disposes of the case, as the brief of the appellant raises and argues no other point.

The questions involved, however, are of so great public importance that we feel it our duty to, as briefly as possible, pass upon them. The record, however, is so voluminous that some pages must be devoted to the effort:

The complaint charges a consummated conspiracy to drive the plaintiff out of the banking business, and to compel him to sell his stock and interest in the Savings Deposit Bank of Minot and to mortgage his residence property to certain of the defendants for an inadequate consideration.

Both as to the conveyances and the orders of the banking board, it is a collateral attack, no attempt having been made to set them aside in the regular and legal way. In addition to this, as we will afterwards show, there is conclusive and undisputed proof of a subsequent ratification.

There are two classes of defendants: (1) The state officials, and (2) the purchasers of plaintiff's stock.

The defendants Governor L. B. Hanna, Secretary of State Thomas Hall, and Attorney General Andrew Miller, and the Chief Examiner S. G. Severtson belong to the first class. The first three mentioned are, by virtue of their respective offices, members of the state banking board, and the fourth, S. G. Severtson, was the chief examiner of banks employed by that board, and also was the secretary of it. Though an employee intrusted with responsible duties, the statute (Comp. Laws 1913, § 5146) does not in any sense make him an independent public officer, but rather an agent of the banking board and subject to its directions and control.

35 N. D.—32.

In the second class belong the defendants Barron, Byorum, Rasmussen, Johnson, McGee, and Greenleaf.

Even if we give the fullest credence to the testimony of the plaintiff, it is clear that no case was proved against any of the defendants, and that the trial court was justified in directing the verdict for them.

The undisputed facts of the case, as disclosed by the record, are as follows: The plaintiff, Grant S. Youmans, was the owner of the controlling interest in the Savings Deposit Bank, of Minot, North Dakota, and in fact held practically all of its stock.

Several examinations were made of this bank by the defendant S. G. Severtson in his capacity of state bank examiner and by his predecessor Oliver Knudson.

As a result of such examinations the plaintiff's banking methods were condemned, directions were given to him at various times to remove objectionable paper, and on the 16th day of October, 1913, the following order was entered: "A special meeting of the state banking board was held in the executive office this 16th day of October, A. D. 1913. Members present were: Governor L. B. Hanna, Secretary of State Thomas Hall, and Attorney General Andrew Miller. The report of the examination of J. B. Schoregge made August 13th of the Savings Deposit Bank, Minot, and the report of the examination made by Mr. Schoregge and Arthur Johannson of the Savings Loan & Trust Company, Minot, September 11th, was presented to the board for its consideration. The board instructed the state examiner to make a special examination of the Savings Deposit Bank, and, if the condition of the bank showed no improvement over the report already submitted, he was further instructed to take charge of the bank pending the appointment of a receiver."

In accordance with this order the defendant Severtson proceeded to Minot and took charge of the plaintiff's bank for the purpose of commencing the usual receivership proceedings to wind up its affairs, and on account of the failure of the bank to remove from its paper some $20,000 to $25,000 worth of objectionable securities. There can be no question that these securities were objectionable and that the witness Severtson was justified in speaking of them as he did as "fake loans." There can, indeed, be no question, and even if we take the testimony of the plaintiff at its face value, that the state banking board was justified

and that it was its duty not only to object to these loans, but to take the action that it did.

Speaking for himself alone, for the other members of the court do not at this time think it necessary or wish to commit themselves upon the proposition, the writer of this opinion is firmly convinced that the action of the banking board in the matter before us was quasi judicial, and that immunity adheres to such judicial action, and this regardless of the motive or intent.

In the opinion of the writer, indeed, the duty is one which is owing to the public rather than to the individual, and it is the public alone which can call the officer to account. Any other rule, he believes, would seriously interfere with the conduct of government and with the provisions of the banking system of the state, the stability and integrity of which is of great public importance. See Mechem, Pub. Off. § 640.

No matter what the rule may be upon this subject, however, there can be no question that where the action taken by a quasijudicial tribunal is justified and right, and if such an action should have been taken, the motive which prompted it is not a subject for judicial investigation.

The general nature of the loans was in fact this: Youmans, besides being interested in the bank, was interested in the Savings Loan & Trust Company. This company had obtained mortgages on certain lands, obtaining at the same time second or commission mortgages. These first mortgages it had sold to third parties. The interest on the first mortgages had been paid either by the trust company or by the mortgagors, but not on the second or commission mortgages. These second mortgages were therefore foreclosed, the trust company purchasing at the sales. Youmans then, or the trust company, pretended to sell this land, encumbered as it was, to practically anyone that could be picked up on the streets, and to men who were mere transient farm laborers, who had no property interests that were known to either Youmans or the trust company or to the bank, or, as far as we can learn from the record, to anyone, and who had not even seen the land and at no time resided thereon, and took back notes and mortgages. The plaintiff, Youmans, then, in spite of the notes, and mortgages, took back deeds to the trust company of the property, for, as far as we can learn, practically no consideration, he himself testifying that the consideration of

one of them was $2, or rather that there was an item of $2 charged on the books for deeds. In spite of these facts, however, Youmans then turned the notes and mortgages over to the bank and took credit therefor, and to such an extent that the deposit and the credit of the trust company on the books of the savings bank was largely increased and beyond the amount of the securities which these notes and mortgages were supposed to replace.

The proof of these facts does not depend upon theory or conjecture, but upon the testimony of Youmans himself.

He testified in part as follows:

I was an officer of the Savings Loan & Trust Company. I had a majority of the stock. I had all but two shares of the common stock, however there were a few shares of outstanding preferred stock. I was the president of that company and managing officer. I had almost exclusive control of both institutions. The offices were in the same building. The same vaults and safes were used. My bank was a purchaser from time to time of a considerable amount of securities of the Savings Loan & Trust Company. Considerable of it was secured by real estate mortgage, the greater portion of it. In disposing of these securities I indorsed the paper over as president of the trust company. It is true that on the 30th day of October, 1912, the Savings Loan & Trust Company sold to my bank and my bank purchased from them about $52,650 for securities approximately.

Q. It is true is it not, that these securities were so transferred, and put into the bank to enable you to remove the objectionable securities that have been mentioned by the examiner in his letter to you?

A. Yes sir, $52,650 was credited to the Savings Loan & Trust Company on April 30th.

At the time the bank was closed in October, 1913, $23,000 of the paper purchased from the trust company in October, 1912, remained in the bank. At the time the bank closed, its entire bills receivable were about $66,000, I believe. $23,000 of the amount was part of the loans bought in October, 1912.

Q. Now I will ask you to give a statement of the notes that were taken over by the bank on the 30th of October.

A. The notes were number 482. Carl Lewellen, mortgage dated October 26, 1912, due December 1, 1921, $2,000.

Q. The next one?

A. Sold back to the company on November 13, 1912, and the cash received by the bank.

Q. Number 483?

A. Carl Lewellen, mortgage, same date, same due date, $2,500. Number 485, Glen Hall, mortgage dated October 25, 1912, due December 1, 1921, $750. Number 485 by the same man, same mortgage, same date, same maturity, $1,000. Number 486, same person and mortgage, same date, same maturity, $2,500. Number 487, same person and mortgage, same date, same maturity, $750. Number 488, Jesse Edison, a mortgage dated October 28, 1912, due December 1, 1921, $2,000. Number 489, the same person and mortgage, same date, same maturity, amount $2,000. Number 490, same person and mortgage, same date, same maturity, $1,200. Number 491, J. E. Routh, a mortgage, same date as last, same maturity, $1,200. Number 492, same person and mortgage, same date, same maturity, $2,500. Number 493, Alvin H. Campbell, a mortgage dated October 26, 1912, due December 21, 1921, $2,000. Number 494, same person and mortgage, same date as last given, same maturity, $2,000. Number 495, Ross J. Olson, a mortgage dated October 28, 1912, due December 1, 1921, $2,000. Number 496, same person and mortgage, same date, same maturity, $2,000. Number 497, same person and mortgage, same date, same maturity, $750. Number 498, Jake Jacobs, a mortgage, October 26, 1912, same maturity, $2,000. Number 499, same person and mortgage, same date, same maturity, $2,000. Number 500, Robert B. Davis, a mortgage October 26, 1912, same maturity $2,000. Number 501, same person and mortgage, same date, same maturity, $2,000. Number 502, James P. McCoy, a mortgage, October 29, 1912, same maturity $2,000. Number 503, same person and mortgage, same date, same maturity, $2,000. Number 504, William N. Ghent, a mortgage, same date, same maturity, $2,000. Number 505, same person and mortgage, same date, same maturity, same amount as last given. Number 506, Edward A. Gabbett, a mortgage, October 30, 1912, same maturity, $2,500. Number 507, same person and mortgage, same date as last given, same maturity, $2,000. Number 508, Joe Wood, a mortgage, October 29, 1912, due December 1, 1921, $2,500. Number 509, same person and mortgage, same date, same maturity, $2,500.

All of these mortgages that I have described were dated between the 25th day of October and the 30th day of October, 1912, inclusive. The face total amount of the mortgages which I have described is $52,650 and that amount corresponds with the amount which appears to the *credit of the Savings Loan & Trust Company.*

Q. The day book of the Savings Deposit Bank of November 13, 1912, shows that loans 484, 487, 499, 485, 491, 490, 498, 497, 504, 482, were charged to the Loan & Trust Company doesn't it?

A. Yes, sir. The trust company gave a check on the bank itself for $8,400, and turned in the trust company note guaranteed by G. S. Youmans for $8,250, the two amounting to $13,650 total.

Q. I call your attention to the paper just marked exhibit P-1, and ask you to state if that was the mortgage that was given to secure the note exhibit P.

A. Yes, sir.

Q. I call your attention to the mortgage just referred to, and ask you to state if it does not recite that it is free of all encumbrance.

A. That is the way the blank reads, but as a matter of fact the land was not at that time. It is true that the record I filed with his note and mortgage shows that the land was encumbered by a former mortgage of $400.

Q. Do you know who William N. Ghent was, the maker of this mortgage?

A. Yes, sir. He bought the land from myself as agent, from the person that held the title, the Savings Loan & Trust Company, the bank or myself, the abstract will show. His business was the business of trying to make a living as a laborer. I first met him all the way from a day to thirty days before this mortgage was given. Had no prior acquaintance with him prior to that time. He owned no property anywhere that I know of.

Q. You sold him this property as an agent either for the trust company or for the bank on the same date this mortgage was given.

A. Either then or prior to that. I think the deed was given to him the same day he gave the mortgage back to the trust company. The consideration shown in the abstract and deed would be right. William H. Ghent was a young man. I think he was single, the mortgage will show. I could not tell whether I first met him at some of the stores or

in the hotel or where. Prior to the first time before the execution of the deed I had never heard of him. I do not remember who introduced us. I could not tell where it was. I do not remember how I came to meet him. He was not working just at that time. He was engaged in the business of working for a living for farmers of North Dakota. He hadn't a position just at that time that I know of. He might have and he might have told me so, but I have forgotten. I don't remember whether I ever saw him doing any work or not. I had lots of men working for myself. He might have worked for me, I don't remember.

Q. You never did any business with him before this in your life?

A. I may have. I cannot single him out. I do not recognize the man. He was quite a good sized man. He probably weighed about 180 pounds. I knew at the time where he came from. I have an affidavit of his. I took it from him at the time he executed exhibit P. I took it principally to have a record of this man, where he came from, his age, and the statement from him as to his status. My only other reason I presume, was the average way, trick of the banker to be dead sure everything was correct.

Q. It was a trick?

A. Yes, and the whole proposition was a trick. They all practise the same way.

Q. I was talking about Grant S. Youmans—you were tricky?

A. Yes, I had to be, but I was not tricky enough to keep out of the grasp of those other fellows. They were too tricky for me. I was trying to trick one of the great number making up the common people. I was using a banker's trick, or playing safe. I was trying to trick Ghent as one of the common people. They have to exploit everyone that comes in order to make any money.

Q. Isn't it a fact that you were trying to play a trick on the state banking board?

A. Not necessarily. I had no thought at all of tricking the banking board.

Q. Didn't have the state banking board or the examiner or any public officials in mind at the time?

A. I might have. I doubt very much whether I though of the state bank examiner at the time the affidavit was drafted and executed. It

isn't a fact that my purpose in taking that affidavit was to make some-one believe that it was a good faith transaction. I did not know that this Ghent transaction was fraudulent. I know that it was not. I don't know whether Ghent had ever seen that land or not. I don't know that he had not. I probably talked a month before about the land, and gave him a description. At the time of making the deal he talked of his wanting to get a piece of land so that he was able to pay for it, that he would be glad to have it as an investment. Probably no con-versation about its character or quality. There must have been. There must have been a conversation about the consideration. Yes, there was. I cannot remember the conversation. It is hard to say who started the deal Ghent or I. I do not remember I could not tell to save my life whether I went after him or he went after me.

Q. Isn't it a fact right there at the same time you took a deed back from him?

A. Subsequently to the time this deal was made. It might have been a day and it might have been a week subsequent.

Q. Isn't it a fact that it was done immediately thereafter?

A. I don't remember.

Q. I draw your attention to the fact that that deed is dated the 29th day of October, and is sworn to on the same day.

A. Yes, that is a fact. It looks that way.

Q. That is the same day these other papers were executed?

A. The papers are dated the same date, but they may not have been executed—half the mortgages in Ward county are not executed on the date the deed shows date.

Q. Do you mean to tell the court and jury that you took this deed a week after this transaction?

A. I am not telling the jury that. I do not remember.

Q. I call your attention to the fact that it was acknowledged on the same day?

A. I am telling you that it is possible that the date may show the acknowledgment as the same day, but it might have been a day or a week later. You can date an acknowledgment back, but it is unsafe to date it ahead.

Q. This notary public was your secretary?

A. Yes.

Q. Isn't it a fact that you put this deed into the bank, the Savings Deposit Bank on the 30th day of October, 1912, that same time that you put the rest of these papers in there?

A. That deed was never in the bank. You bet I kept it in my pocket all the time.

Q. Then the transaction came to this, this man that you do not remember, that you do not remember where you saw him, and when and what he looks like, bought a piece of land from your trust company, and gave a mortgage back on it for $2,000 and a note, and you took an affidavit from him, and then you took back from him a deed to yourself, and then you took that note and mortgage and put it in the savings bank, isn't that a fact?

A. A part is a fact and the other is not. When you state as to my saying I do not remember of ever seeing the man or ever knowing him, as a matter of fact I did know the man, and I saw him the day the papers were executed.

Q. Do you know where the man went after he finished the transaction?

A. Yes; went to work in the vicinity of Minot, for some farmer. I do not know who paid him, no. I saw him on several occasions after that when he came in for Sunday, three or four times. I think it is safe to say at least four times. I think on the street I stopped and talked to him. I cannot tell you whether he ever lived on the land.

Q. And at the time Ghent gave you back the deed no money changed hands?

A. Yes, sir. I do not remember how much. It might have been $1 or 1 to $10. Our notation tells where I paid $2 for deeds. By that I mean I paid $2 for executing the deed.

Q. And the deed you refer to is exhibit P-3?

A. Yes, sir, that is one of the deeds he executed to me. I think I had two transactions with that fellow of the same nature as this one.

Q. What was the other one. What is the date of the other transaction?

A. I think it was the same transaction, the same date I think. The same time, I think so. Involving another piece of land. We went through all this same procedure.

We cannot cumber this opinion by going any further into this evidence. It is sufficient to say that, according to the plaintiff's own testimony, this procedure was followed in many instances.

The plaintiff, Youmans himself, admitted that it was "just a small trick that he had learned when he was in the banker's fraternity to make land available for commercial purposes," and that the way he had to do business was "to grab everything in sight and give as little as possible."

How in the face of this record any person can question the right of the bank examiners to close the bank in question, it is difficult to see. Oliver Knudson, a previous state bank examiner, had found fault with the bank, and demanded that some $40,000 worth of bad securities should be withdrawn and others replaced. In order to do this the plaintiff turns in some $57,000 worth of securities which are the sweepings of his own trust company, and by that transaction increases the liability of the bank to that company to the extent of some $90,000. Of this amount, too, some twenty or twenty-three thousand dollars worth are of the nature of the alleged Ghent loan and mortgage. The purpose of bank supervision is clearly to protect the depositors and the public, and, as we have before stated, not only was the board of bank examiners and was the defendant Severtson justified in the action that was taken, but they would have been remiss in their public duty if they had not taken it.

So, too, as we have also stated, if the orders of the board were in any way illegal or oppressive, an appeal could have been taken from their action to the courts, and this was never taken.

It is also elementary, and must be evident to all, that there can be no such thing as a conspiracy to do a lawful act in a lawful manner, and much less an act which it is one's duty to the public to perform.

It is also clear that the presumption of good faith and necessity applies to the discretionary acts of public officials such as those before us, and that where there is a remedy prescribed for the reviewing of these acts that that remedy must be resorted to before their order or judgment can be set aside.

It is also clear that such a remedy or method of review was prescribed by the legislature, and that no such relief was ever applied for or resorted to. The statute indeed provides, among other things, that "any

and all orders made by said board shall be immediately operative and remain in full force until modified, amended, or annulled by such board, *or by a court of competent jurisdiction, in an action to be commenced by the party* against whom such order may have been issued." Comp. Laws 1913, ¶ 3, § 5146.

We are not only satisfied that there is no proof in the record which is before us of any improper motive on the part of the public officials mentioned, but that all of the above considerations and rules of law apply, and that even if there were any improper motives no cause of action was proved. We base this conclusion almost entirely upon the testimony of the plaintiff and appellant himself, and, where not upon his testimony alone, upon testimony which is uncontradicted and undisputed.

There is no question that sometime previous to the making of the order herein complained of that Severtson's predecessor and the then Chief Bank Examiner Oliver Knudson had criticized the conduct of the bank, and that questionable securities to a large amount had been ordered to be withdrawn and either cash or acceptable securities substituted therefor, and that no attempt was made to have this order set aside by any competent tribunal.

It is also clear that in order to comply with this order the plaintiff resorted to what he himself termed "a banker's trick," and obtained from the Savings Loan & Trust Company, which he himself practically owned, some $52,650 worth of securities, which, to say the least, were of a very questionable character.

There can be no question that when Severtson visited the bank on October 18, 1913, he found that the liabilities of the bank were about $61,903.37, and its loans and discounts about $66,000, and that practically all of these loans and discounts made up of the questionable securities taken from the Savings Loan & Trust Company, and the notes of the plaintiff and his wife and brother.

There can be no question that at the time of the closing of the bank at least $20,000 of these securities were absolutely undesirable and such as no bank should claim as assets, and that they merited the characterization of "fake loans" which Severtson gave to them.

Such being the case the action falls as to the official defendants.

As to the purchasers of the bank, the remaining defendants, there is

absolutely no evidence of fraud or duress, and at no time was there any effort or attempt to set aside the conveyance. The proof, on the other hand, shows a subsequent ratification. This, too, is apparent from the plaintiff's own testimony.

He testified that:

Q. Explain to the jury what took place between you and Mr. McGee and Mr. Severtson when Mr. McGee came it?

A. When Mr. McGee came in we were in the back room, he came in the side door, if I remember right, at least he walked back there and I went and introduced him to Mr. Severtson. Either one or the other admitted having met. They did not shake hands anyway and we went into the front office. They went in first.

"They did not ask me to go; they talked probably two or three minutes and then called me. I went in and Mr. Severtson said that $20,000 was the amount. That was 2 o'clock Sunday in Mr. McGee's presence. That was the amount I was to work on. McGee said, "Don't you think I had better see Bob about it?" Severtson said he better see Roach about it. There was but very little said there, when we sat there facing my director and my attorney he says, "My God, don't tell them that I have not paid for my stock," I said, "George, I can't see where that will harm you any." "Well" he says, "I don't want them to know it," and that was about all that was said at that time. The next day, Monday afternoon, I think I was in his office about 4:15 o'clock. There was nobody there but McGee and his clerks. The conversation was, of course, about the affair. He wanted to know what I was going to do. He said, "What are you going to do about this thing?" I said, "It don't look as though I can do very much except what they tell me to do." I says, "My friends have all abandoned me, my bankers have abandoned me, and my attorneys have abandoned me, and I don't know which way to turn." He said something had to be done and mighty quick. During that conversation he threatened me with prosecution. He says, "Something has got to be done to save you from prosecution and trouble." I answered, "If there was any prosecution it would be on trumped up evidence. He referred to something that had been said about a false statement to the banking department, and intimated that there had been false statements. I told him there was no such thing in existence; that

I had never made a false statement in my life to the banking board, and he said, "Probably you have not." He did not say on what particular ground any prosecution would be. It was a very short interview. A couple of days later he called me up on the telephone and told me to come right up to his office, and I went. He then told me of some local parties, possibly the Second National Bank People, who were willing to put up the money and take over the bank. He said any one of them can write a check for the whole amount, and I told him it was good news if it was true and then followed the discussion of terms. First he wanted a $10,000 bonus, and I told him it was too much, I could not think of it. I declined the proposition and left him. I think he called me up the next morning with the proposition that they would come down and take the thing over for $5,000, and I told him I would think it over, and any settlement made would have to be made on a basis of where they would keep their hands off the Savings Loan & Trust Company business. He had said nothing about the prosecution of that company. He did not say what could cause any prosecution, just simply made the proposition they would relieve me of prosecution, that I was subject to prosecution. I only wanted "hands-off policy" on the Savings Loan & Trust Company. He talked it over that it would be better to have a receiver for the trust company and the bank at the same time, have the whole thing cleaned up. No one else was present at that conversation. He suggested the propriety of a receiver for the bank and the trust company.

Q. At this time no threats were made?

A. Just about the threat to have a receiver appointed for all of my business. I took it as a threat.

Q. Suggestion that it ought to be done?

A. Yes.

With reference to the receiver, he said, "I think I will have Francis Murphy appointed receiver for both the bank and the trust company," and he said he had already seen him. I told him that if the trust company was let alone, there was no possibility for having a receiver appointed for that, as it was in no danger, and in very good condition, and all that was wrong in the world was about $20,000 of loans in the bank. I don't remember that he answered me at all, and that is the summed-up facts of what happened at that conversation. I went back

to the bank that morning, I think it was about Tuesday or Wednesday that he called me up over the telephone and he said, "How about that offer?" I says, "I don't know, if I can be sure of hands-off policy I guess I had better let you have the bank;" and he said, "If you say so, I will have the bunch down there in fifteen minutes and close the deal." By "bunch" I refer to Mr. Roach, Mr. Barron, Mr. Johnson, Mr. Rasmussen, and Mr. McGee. They came and went into session in the back room of the bank, and called me in, and I had a conference there with all of them. A memoranda of the contract was made, which is here, stating the terms under which I was to turn over the whole business. Mr. McGee did the talking. He called me in, or at least somebody did into the back room. When I got there they were sitting around in a circle smoking, and he said, "Well, we might just as well come to terms." I says, "All right, I want to take down a memoranda of this transaction," and I took a piece of paper and as the terms were discussed I put them down. He says, "These men are willing to take over the bank with a $5,000 bonus, and open it up and protect your depositors." I have that memoranda and can give the terms of the verbal contract, verbal agreement that was there made up and later embraced in a written contract. I made the memoranda myself. Mr. McGee said, "These men are willing to take over this bank and open it up and pay off the depositors if you and your wife will surrender all of your stock, and resign as an officer and director, and turn over everything besides giving them a $5,000 bonus," and I answered, "Well, just let me know for sure how I will come out on this, now if I surrender my stock and my wife's stock and give you a mortgage on my homestead of $5,000 I will expect to have the excessive loans canceled, charged off, and delivered to me," and that was agreed to. Then within five minutes afterwards Barron backed up on that. He didn't say anything to me, he went over in the corner with Mr. McGee and they had a whispered conversation and came back and McGee says, "I don't know whether we want to give up these mortgages or not," but I had it jotted down and it stood in my mind as one of the features. McGee said, "I don't know whether that will be done or not." I said, "I will expect that to be done," and I did. He said, "The twelve farms will have to be deeded over to the bank on which the excessive loans are," and I agreed to that, and when the notes were made and the thing was agreed

to, and we all understood the terms, then McGee called me aside and he says: "You will have to come across with that $1,000 note of mine." I told him that while it was another hold-up I will have to do it if I can be sure of hands-off policy towards my company, and he said, "All right, will you give me that note?" and I said, "I will give it to you when this bank is opened up and my depositors paid off." That was right at the same session, and the other boys were sitting there, and McGee and I at one side talking in a low whisper. I think perhaps Mr. Schoregge was there also, but I doubt it. So, we went back and took our seats, and McGee asked each one present if the terms were agreed to and satisfactory, and they all answered "yes," and he said to me, "I will go right down to my office and draw up a contract covering these items and terms, and I will have you come down and sign it." That was about 4:30 in the afternoon when the meeting broke up. About 9 o'clock in the evening McGee called me up and said the contracts were ready. It was possibly Wednesday or Thursday, I don't remember. I have the original contract which was later signed. It was drawn on October 22d. It would be Tuesday or Wednesday. That night he called me up at about 9 o'clock and I went down to his office and found Mr. McGee, Mr. Rasmussen, and Mr. Barron in McGee's office, and one or two of the clerks in the front office. He handed me a typewritten paper and he says, "There is the contract, read it over," and I said, "Well, George, this is not the contract we made." I didn't sign it, I handed it back to him, and he right promptly, without any discussion, called in his clerk and dictated a new contract and made it conform a little more to the original agreement. I took the contract and left them and went over it. I was absent about an hour thinking about it and looking it over, and when I returned I told him it was not the contract that had been agreed upon, and McGee dictated a new contract. That contract was executed at that time. McGee went along with me up to my home. We went out and had the contract signed by my wife. After it was signed by her he took the contract away and I stayed home. Whatever was said by any of those parties was said before the contract was signed. No statement was made to James Johnson. He was not present. Mr. Rasmussen talked over the bank and its business, and what the assets amounted to, and about the farms, and whether he could have all the clerks and all of the furniture in the bank and everything

in sight. I think it was the next day when the transfer of my stock was turned over and we were in the back room of the bank. McGee was there and James Johnson was there and Rasmussen and Barron, Mr. Roach, and myself. The stock had not been delivered at that time. It was probably about the same time that I turned the stock over in trust in Mr. Schoregge's hands to be delivered to them whenever they did certain things. I don't know whether he turned over the stock or not. I had turned it over to Mr. Schoregge in a conditional way. The time when I met these defendants, including McGee at the bank, or when these shares of stock were turned over to Mr. Schoregge, when I was admitted to the back room, McGee asked me this: "We just wanted you in," he said, "to see if everything was on the square," and I made the statement, "Gentlemen, you ought to be pleased with the deal you have pulled off, you have gotten a bank that has doubled its deposits in sixty days, and you have pulled over a very profitable deal for this. You have caused me to lose $25,000 on this deal," and I got out. I think Mr. Schoregge was in the same room. Mr. Severtson had left for Bismarck.

Q. After that time you had nothing more to do with the bank?

A. No, sir, except to help them in every way I could. I got my stuff out of the bank, which they ordered me to do immediately, that is, remove the assets of the trust company and some few pieces of furniture they let me remove. All the assets of the Savings Loan & Trust Company were in the bank at that time.

The record also shows that the plaintiff himself, while negotiating with one Porter for the purchase of the bank, or for other assistance, placed the assets of the bank, excluding the questionable securities, at the sum of $44,165 and the liabilities at $44,000. The transaction was simply this: In consideration for a note and mortgage from Youmans to them for $5,000 they agreed to take this bank off his hands, whose assets and liabilities were even or practically even in amount, but whose reputation and credit had been besmirched by the conduct of plaintiff himself, and to relieve the plaintiff of all other liability in the matter.

It is a general rule of law that whatever one man may do, all men may do, and what all men may do singly, they may do in concert, and, if the

sole purpose of a combination is to advance the proper interests of its members the fact of the combination does not of itself make an otherwise lawful act unlawful. 2 Mod. Am. Law, 425. (This rule is subject to exceptions, as where concerted action, such as hissing at a theater, makes a nuisance of that which, if done by one alone, would be harmless.)

Calling a transaction a conspiracy does not make it such, nor do mere epithets in a pleading constitute evidence. Root v. Rose, 6 N. D. 575, 72 N. W. 1022.

Damages, too, are at the basis of and are the gist of the action, and where no damages are proved no cause of recovery exists. Martens v. Reilly, 109 Wis. 464, 84 N. W. 840; Commercial Union Assur. Co. v. Shoemaker, 63 Neb. 173, 88 N. W. 156.

There is absolutely no proof of fraud or duress in obtaining the execution of the contract, nor is there any evidence of an unlawful conspiracy on the part of these purchasers. The matter of the purchase was gone over on several different occasions between the plaintiff and the purchasers, and the contract was twice changed at the plaintiff's suggestion, and in fact, new contracts were drawn. Plaintiff's own testimony clearly shows that not only was the contract involved freely entered into and based upon adequate consideration, but that he subsequently, with full knowledge, fully and completely ratified the transaction. Even if errors were committed in the execution of testimony (and on this we express no opinion, as plaintiff has wholly failed to call any such error to our attention, and, as already stated, not a single assignment of error has been argued on the merits), still the plaintiff's own testimony demonstrates beyond question that there was no merit in his case, and that it was the duty of the district judge to direct the verdict which he did.

The judgment of the District Court is affirmed.

On Motion to Vacate Order Denying Rehearing (March 15, 1917).
Denied.

Cole, J., District Judge. By an opinion of this court filed December 2, 1916, ante, 479, 160 N. W. 705, this court affirmed the judgment

35 N. D.—33.

of the trial court. A petition for rehearing was filed on December 22, 1916, and on December 28, 1916, an order was entered denying a rehearing. The remittitur was thereupon transmitted to, and judgment entered thereon in, the district court. On January 2, 1917, the plaintiff filed a motion to vacate the order denying a rehearing. Such motion is based on the following grounds: "That Judges Fisk, Burke, and Goss participated in the deliberations of the court and in the decision denying the application, and were not judges of this court at said time, their term of office having expired upon the first Monday in December of the year 1916, and the said three persons constituting a majority of those assuming to act as the supreme court of this state, and being without legal right or authority to so act, the order denying the said motion was without authority of law and void.

"That the said order amounts in effect to a complete denial of justice in the above-entitled action, no fair hearing upon the merits having ever been allowed in this action in this court."

On the 5th day of January, 1917, this court made the following order:

"Ordered, Further, that the said motion of the said Arthur LeSueur and all matters pertaining thereto to be heard before the supreme court of this state at the Capitol on Tuesday, January 16th, at 10 o'clock A. M."

On the 16th day of January the court assembled, with four judges present, and upon request of counsel for plaintiff and appellant the court adjourned to January 17th, 1917, at 10 o'clock A. M., at which time five judges were present: District Judges J. M. Hanley and A. T. Cole sitting by request in the place of Judges Birdzell and Grace, who regarded themselves as disqualified.

On said 17th day of January, 1917, arguments on the part of counsel for plaintiff and appellant and counsel for defendants and respondents were heard.

The first reason assigned for asking that the order denying the application of the appellant for a rehearing should be set aside and vacated, and the rehearing granted, is that Judges Fisk, Burke, and Goss participated in the deliberations of the court and in the decision denying the application, and were not judges of this court at said time, their term of office having expired on the first Monday in December of the year 1916, and that they had no legal right or authority to act, and there-

fore the order denying said motion for a rehearing was without authority of law and void.

The reason thus presented for a vacation of the order denying a rehearing presents the identical question which was considered and determined by this court in State ex rel. Linde v. Robinson, ante, 410, 417, 160 N. W. 512, 514. The plaintiff contends, however, that the opinion in State ex rel. Linde v. Robinson, ante, 410, 160 N. W. 514, is of no force or effect, and does not constitute an opinion of this court for the reason that it was promulgated by four district judges purporting to sit and act as judges of the supreme court, and it is contended that the supreme court cannot be constituted wholly of district judges. This question was considered in the opinions above referred to, and a contrary conclusion announced therein. We have again reviewed this question, however, and the court as now constituted are of the opinion that a district judge when called to sit in a cause pending in the supreme court becomes for all purposes of that cause a judge of the supreme court, and as such is invested with the same power and impressed with the same duties and obligations as those possessed by and imposed upon a person regularly elected a judge of the supreme court. And in our opinion the people have in § 100 of the Constitution designated the persons from whom justices of the supreme court may be chosen to take the place or places of any or all of the justices of the supreme court in any cause wherein any or all of such justices may be disqualified. The section of the Constitution referred to must have a reasonable and effective interpretation, and therefore if it should so happen, as it may happen, that for some reason all of the justices of the supreme court shall feel themselves disqualified to sit in any particular cause, a full number of judges of the district court may be called in, who, for the purposes of the cause in which they are sitting, are clothed with the full power of the regularly elected and sitting justices.

It is also suggested that the opinion in State ex rel. Linde v. Robinson, ante, 410, 160 N. W. 512, wherein Justices Bruce and Christianson participated, is inconsistent with the opinion in the same cause promulgated by the four district judges sitting as justices of this court, and published in ante, 417, 160 N. W. 514, for the reason that the former opinion held "that Justices Bruce and Christianson ought to be relieved from participating in the hearing of the merits of the controversy unless the contend-

ing parties insisted upon their participation," while the subsequent opinion, published in ante, 417, 160 N. W. 514, shows that objection was made to the jurisdiction of the court as then constituted. It is therefore contended that Justices Bruce and Christianson ought to have participated in the latter decision. We have carefully examined the record and find that this contention is wholly untenable. It is true, the justices elect filed written objections to the jurisdiction of the court, but such objection in no manner either suggested or requested that Justices Bruce and Christianson participate in the determination of the controversy. On the contrary, it was specifically asserted in the written objections so filed that "Justices Bruce and Christianson are equally interested in the outcome because it affects their term of office."

The position assumed by counsel for the justices elect was: (1) That all the members of the supreme court had a sufficient interest in the controversy then pending to disqualify them from participating. (2) That the supreme court of this state cannot consist solely of district judges called in to sit in places of disqualified justices of the supreme court, but that one or more of the regularly elected justices of the supreme court must necessarily participate in the decision of each cause. If this contention was carried to its logical conclusion, it would follow that in any cause in which the justices of the supreme court were disqualified one or more of such justices must sit as a judge in his own cause, or else justice be defeated because no tribunal existed to settle the controversy. Such construction of § 100 of the Constitution would tend to defeat the obvious purpose of its enactment, and convict its framers of having intended to negative, and in certain cases destroy, the very object they sought to promote.

And while we are not directly concerned with the decision in State ex rel. Linde v. Robinson, ante, 417, 160 N. W. 514, and find it unnecessary to express either our approval or disapproval of the principles of law therein announced, we are all agreed that that decision, promulgated by four district judges sitting as judges of the supreme court, is in fact the opinion of the supreme court of North Dakota, and entitled to the same consideration as though it had been promulgated by four regularly elected justices of the supreme court.

The question whether the terms of office of Judges Fisk, Burke, and Goss expired on the first Monday in December, 1916, or the first

Monday in January, 1917, is not involved in the instant case, however. The question is whether they were in fact either *de jure* or *de facto* judges. And we are all agreed that they were in any event officers *de facto*.

The authorities generally recognize that the three essential requisites of an officer *de facto* are:

1. The office held by him must have a *de jure* existence, or at least one recognized by law.

2. He must be in the actual possession thereof; and,

3. His holding must be under color of title or authority. Constantineau, De Facto Doctrine, §§ 26 et seq.; 29 Cyc. 1389 et seq.

In the case at bar the existence of the *de jure* office is conceded. Consequently, Fisk, Burke, and Goss were *de facto* judges provided:

1. They were in possession of the office.

2. Were holding over under color of title or of authority.

There can be no question whatever about the first proposition. They were concededly in possession of their respective offices, and were at no time dispossessed. They were recognized as incumbents of such offices by the clerk, marshal, and reporter of the supreme court, as well as by Justices Bruce and Christianson, the two hold-over judges whose membership in the court was not in dispute. They occupied the official chambers set aside for justices of the supreme court and formerly occupied by them in the state capitol. They were also recognized by the various executive officers as incumbents of the offices. For instance, Chief Justice Fisk was recognized by the board of pardons; the state auditor and state treasurer, respectively, recognized their incumbency, and warrants for their salaries were drawn by the state auditor, and paid by the state treasurer. They were also recognized by the various litigants and attorneys having business in the supreme court of the state of North Dakota and the various public officers required to transact business with the court. The record fails to show a single case wherein their authority to act during the month of December was questioned by any litigant or attorney. In fact the attorneys for the plaintiff in this case in the petition for rehearing made no objection to the disposition thereof or consideration of the same by the court as then constituted.

There is no question of the original authority or legal warrant of Justices Fisk, Burke, and Goss to occupy their respective offices. They

received their authority directly from the people, and in accordance with a practical construction of the Constitution, concurred in by every member of the court for a quarter of a century, and in which they concurred, when they assumed their respective offices, they claimed the right to exercise the duties of their respective offices during the month of December. They were never ousted from possession, but continually remained in possession of, and were apparently and to all intents and purposes in full possession of, their offices, and continued to exercise the duties thereof. In addition to this, the decision in State ex rel. Linde v. Robinson, ante, 417, 160 N. W. 514, filed December 11, 1916, held that Justices Fisk, Burke, and Goss were in fact *de jure* officers, and entitled to hold and occupy their respective offices as a matter of right.

If it be assumed that Fisk, Burke, and Goss were not *de jure* judges, it still seems manifest that they were *de facto* judges. In fact it is hard to conceive of a case more clearly within the *de facto* doctrine. And the fact that the acts of officers, *de facto,* and not *de jure,* are binding, is well settled by a uniform line of decisions, unbroken practically by adverse decisions, where the officers are *de jure,* and this has been held in many instances where the office or offices themselves were not in fact *de jure*.

In this connection it will be well to note a few of the leading decisions, among which is the case of Lang v. Bayonne, 15 L.R.A.(N.S.) at page 93, and numerous cases therein cited. In our own state the matter has been up for decision and decided by our own court in the case of the State ex rel. Bookmeier v. Ely, 16 N. D. 569, 14 L.R.A.(N.S.) 638, 13 N. W. 711, and also in the case of the State v. Bednar, 18 N. D. 484, 121 N. W. 614, 20 Ann. Cas. 458. In the first mentioned case the following language is used: "The books are full of cases attempting to define a *de facto* officer; but it is generally conceded that no precise definition can be given fitting all cases, and that each case must be determined largely upon its own facts. We have carefully examined a great number of authorities on this subject, and, as to the reason for courts holding officers illegally in possession of an office officers *de facto,* and their acts valid, find that the statement of this doctrine most generally accepted is contained in Plymouth v. Painter, 17 Conn. 585, 44 Am. Dec. 574, where the court says: 'The principle established in these

cases in regard to the proceedings of officers *de facto,* acting under color of title, is one founded in policy and convenience, is most salutary in its operation, and is, indeed, necessary for the protection of the rights of individuals and the security of the public peace. The rights of no person claiming title or interest under or through the proceedings of an officer having an apparent authority to act would be safe if he were obliged to examine the legality of the title of such officer up to its original source, and the title or interest of such person were held to be invalidated by any accidental defect or failure in the appointment, election, or qualification of such officer, or in the rights of those from whom his election or appointment emanated. Nor could the supremacy of the laws be maintained, or their execution enforced, if the acts of the officers having a colorable, but not legal, title, were to be deemed invalid.' "

This case also cites the case of the State v. Carroll, 38 Conn. 449, 9 Am. Rep. 409, and the case of People ex rel. Norfleet v. Staton, 73 N. C. 546, 21 Am. Rep. 479.

In Brown v. O'Connell, 36 Conn. 432, 4 Am. Rep. 89, it is held that an officer in possession of an office, although appointed by a body without authority to make the appointment, is an officer *de facto.*

The case of Brady v. Howe, 50 Miss. 607, holds that a person appointed to the office of judge, although the governor had no legal authority to make the appointment, for the reason that the office was filled by one whom the governor had no power to remove, was nevertheless an officer *de facto.*

In the case of the State v. Bloom, 17 Wis. 521, it was held that if a person is convicted and sentenced at a term of court held by a person exercising the office of judge of such court under appointment of the governor, and without authority of law, there being no person entitled to exercise such office, the sentence is nevertheless valid and binding as against collateral attack by habeas corpus.

In McCraw v. Williams, 33 Gratt. 510, a person elected as judge and commissioned as such entered upon the duties of the office in the belief that his term commenced immediately, and he was held to be a *de facto* officer, notwithstanding that his term did not legally commence until a considerable later date, and his predecessor's term had not expired.

In the case of Ex parte State ex rel. Atty. Gen. 142 Ala. 87, 110 Am. St. Rep. 20, 38 So. 835, the court passed upon the matter of the state of Alabama having created a judicial circuit and the office of judge thereof by an unconstitutional and void statute, but independently of the statute there was in a certain county a circuit for that county and a circuit judge. The judge commissioned by the governor under the void statute attempted to exercise the duties of the office of circuit judge of the county in question, and it was held that he was an officer *de facto,* and his acts valid.

In the case of Cleveland v. McCanna, 7 N. D. 455, 41 L.R.A. 852, 66 Am. St. Rep. 670, 75 N. W. 908, it was held that "it is well settled that the validity of the acts of a *de facto* officer cannot be attacked in a collateral proceeding."

In the case of the State v. Bednar, heretofore cited, the previous decision in the case of the State v. Ely, heretofore cited, was affirmed, and in it the court quotes from the case of Coyle v. Com. 104 Pa. 117, 4 Am. Crim. Rep. 379, and among other language the following: "A judge *de facto* assumes the exercise of a part of the prerogative of sovereignty, and the legality of that assumption is open to the attack by the sovereign power alone. If the question may be raised by one private suitor, it may be raised by all, and the administration of justice would, under such circumstances, prove a failure. It is not denied that Judge McLean was a judge *de facto,* and, if so, he is a judge *de jure* as to all parties except the commonwealth."

In the case of Cole v. Black River Falls, 57 Wis. 110, 14 N. W. 906, the following language is used: "If the offices exist *de jure,* then it is the settled doctrine of this court, as well as of other courts, that all persons who are in the exercise of the duties of such offices by color of law are officers *de facto,* and their acts are valid. And the fact that they are in by color of a law which is unconstitutional and void, does not make an exception to the rule."

No law ever contemplated an interregnum or hiatus in office. Every government instituted and its several subdivisions in this country have been instituted and are maintained upon the idea that the working form or forms of such government or governments, the different instrumentalities making up the executive and judicial branches, shall continue to operate without there being any measure of time when such executive,

or judicial branch has no working power and no official acting for it. This purpose in governments like ours is that all changes, if changes are made, shall be made peacefully and without revolution, and to assure this there must at all times exist within the executive and judicial branches of the government a working power, sometimes it may be without being *de jure* in fact, but, nevertheless *de facto,* exercising *de jure* powers for the time being, and which the people are bound to respect, and the acts of which are binding upon the constitutent members of each particular branch or subdivision of government.

Were it otherwise our county would be subjected to the uncertainties of complete change, and revolutions so characteristic in the past of many of our Central and South American governments and even our neighboring nation to the south, unfortunate Mexico.

In the case of Ball v. United States, 140 U. S. 118, 35 L. ed. 377, 11 Sup. Ct. Rep. 761, the opinion being delivered by Chief Justice Fuller, the following language is used: "We are of the opinion that the irregularities alleged did not place Judge Boarman, in holding the October term, in any other position than that of a judge *de jure,* and that as to the April term he was judge *de facto,* if not *de jure,* and his acts as such are not open to collateral attack."

This part of the opinion is followed by numerous citations, including a number of different states.

In the case of McDowell v. United States, 159 U. S. 596, 40 L. ed. 271, 16 Sup. Ct. Rep. 111, the opinion being written by Justice Brewer, it is stated that "the rule is well settled that where there is an office to be filled and one acting under color of authority fills the office and discharges its duties, his actions are those of an officer *de facto* and binding upon the public."

In the case of Byer v. Harris, 77 N. J. L. 304, 72 Atl. 136, the following language is used: "Whether he was authorized to hold the court at the time, or at all, was of no moment in this proceeding, as he was a *de facto* magistrate, whose proceedings cannot be attacked in this way in these proceedings."

This was the case of a police magistrate, and the court holds, as seemingly all courts do, that to try the title to an office one must, through the medium of the commonwealth, secure or initiate the proceed-

ings under quo warranto, and the title never can be tried in a collateral proceeding or by collateral attack.

The question of the power of *de facto* officers to act and their acts being valid has been considered by the courts of practically every state in the Union and the binding character of the acts of *de facto* officers sustained, not only as to judicial matters, but as to nearly all classes of offices, superior or inferior, which go to make a part of national, state and municipal governments.

There must be a finality in all matters litigated in the courts of this state, as well as the courts throughout the entire United States. The supreme court is the court of last resort, and it, being the court of last resort, must finally determine and settle all matters before it. If, because it may happen that justice may not have been absolute or equal in some case or proceeding as a matter of fact, one may come into court after a final legal determination of the issue as provided by the people themselves through their Constitution and laws, and reopen any particular case and again bring it into being, then there will be no finality in any legal proceeding, no security of title, and any and every decision of a court of final resort will be in its nature but a temporary, rather than a final and absolute, determination, and no controversy could ever be said to be set at rest.

No human institution has ever been devised that could ever and always balance the scales of justice between two contending parties. Absolute justice cannot be looked for so as to evenly balance the scales at all times and in all matters between parties who are at issue as to their respective rights. If there could be an equal and exact balancing of justice and right between contending humanity, then there would be no need of courts, because there would be no controversy for courts to settle.

Many an issue that has a final determination in the court or courts of last resort may leave some doubt in humanity as to whether or not justice has been done and the scales evenly balanced in trial and appellate courts. This is but the exemplification of the imperfections of humanity, and illustrates the fact that there must be a finality and a final determination of issues, and the question of exact and equal justice cannot forever continue to keep open a controversy, and never end.

Courts have been so emphatic in insisting upon a final determination

that even so important a matter as the conviction and sentence of a man to be executed has not been permitted to be attacked collaterally, but such conviction and sentence upheld and the sentence carried out under the affirmance and direction of the supreme court, even where it may be that the trial judge might have been ousted from his office under quo warranto.

The case of the People v. Sessovich, 29 Cal. 480, is an illustration of this fact. There the defendant was convicted and sentenced to be hung, and an appeal was made to the supreme court of that state, the questions on appeal having, among other questions, a challenge as to the trial judge having a right to his office. The court in that case held that that question could not be raised in a collateral way, and affirmed the judgment. Among other language used in that case was the following: "The acts of *de facto* officers must be held valid as respects the public and rights of third persons. A contrary doctrine, for obvious reasons, would lead to most pernicious results."

In the case of the State v. Brown, 12 Minn. 538, Gil. 448, the defendant was indicted for murder in the first degree and found guilty of murder in the second degree. On appeal to the supreme court the question was attempted to be raised as to the right of the trial judge to hold his office. The right to attack in this collateral manner was denied, and among other language used in the opinion is the following: "Whether the judge's term of office had legally expired is a question that cannot be decided in this action. He was, at least, an officer *de facto*, and until his right to the office is settled by a direct proceeding for that purpose it cannot be legally questioned in a collateral proceeding."

In the case of Joseph v. Cawthorn, 74 Ala. 411, Judge Somerville used the following language: "There is no distinction in law between the official acts of an officer *de jure*, and those of an officer *de facto*. So far as the public and third persons are concerned the acts of the one have precisely the same force and effect as the acts of the other. The only difference between the two is, that the latter may be ousted from his office by a direct proceeding against him in the nature of quo warranto, and the former cannot. Their official acts are equally valid. The rule is one which is dictated alike by principles of justice and public policy. It would be a great hardship if innocent persons were made

to suffer by the unknown negligence of officials who, under color of office, were daily holding themselves out to the public as officers *de jure.*" See also Com. v. Wotton, 201 Mass. 81, 87 N. E. 202.

In the case of the State ex rel. Knowlton v. Williams, 5 Wis. 308, 68 Am. Dec. 65, the following language is used: "Courts take notice of accession to office of officers under the Constitution, and while they remain in office and exercise the duties thereof, regard them as officers *de facto.* Generally, as respects third persons, the acts of an officer *de facto* are to be recognized as valid."

We have cited these last-mentioned cases in connection with the matter of the finality of proceedings in the appellate court. There must be an end to litigation, there must be a final determination of the rights of litigants, and for this purpose appellate courts are created. If, after a case has been finally determined and disposed of in the appellate court provided by the Constitution and laws of a state, it may be recalled and again reheard, there would be no end to controversies between parties or litigation, there would be no final determination as to rights or titles, and all rights, both of a personal and property nature, would at all times be insecure. If, after a final determination, a matter may be recalled because some one feels that justice has not been equally balanced, then if two parties were at issue upon the question of title to land, for illustration, when the appellate court had finally determined the title and disposed of it, such title would still be insecure and unsafe and liable to be changed and reversed on a recall of the litigation, because some one came into court claiming injustice at some point in the litigation.

It may not be improper in this connection to advert to the fact that during the year 1916, particularly, the year just passed, when the litigation in the case under consideration was had, there was tense civil contention between different elements of the people in the state upon the proposition of radically changing the governmental ideas of our commonwealth. This tense contention necessarily to a greater or less extent prevented a large number of citizens of the state from giving the calm and judicial consideration to matters involved in litigation and the interests of the people generally that would help arrive at just and reasonable conclusions, and for this reason there perhaps crept into

the case we are now considering in this opinion a feeling of rivalry where there should have been a mere matter of disputed right.

Judges Fisk, Burke, and Goss were continuing to hold their offices during the month of December as the justices of the supreme court had continued to do from statehood up to the present time. They were working under the sanction, not only of their oaths as justices of the supreme court, but the precedent established and maintained from the beginning of statehood.

This court is invested with three separate and distinct grants of jurisdiction: 1. Appellate jurisdiction. 2. Superintending jurisdiction over inferior courts. 3. Original jurisdiction in certain causes involving questions *publici juris,* and affecting the sovereignty of the state or its franchises or prerogatives or the liberties of its people. Const. §§ 86,· 87.

In this case the appellate jurisdiction alone is involved. The Constitution provides that this jurisdiction be exercised under such regulations as may be prescribed by law. Const. § 109.

When an appeal is taken, the supreme court becomes invested with jurisdiction. It retains such jurisdiction until the cause is disposed of and the remittitur sent down to the court below. Can it afterwards reinvest itself with jurisdiction? We think not unless it appears that remittitur was sent down through inadvertence, mistake, or fraud. And when it appears that after decision the remittitur is sent down intentionally in accordance with the court's order properly made in the usual way, the supreme court loses all control over the cause, and cannot subsequently recall the remittitur any more than it may ask that a cause be forwarded to it for decision in which no appeal has been taken. See State v. Sund, 25 N. D. 59, 140 N. W. 716; Hilemen v. Nygaard, 31 N. D. 419, 154 N. W. 529, Ann. Cas. 1917A, 282.

This court has been appealed to from what is claimed to be the standpoint of justice. Upon argument counsel for plaintiff and appellant strenuously insisted that gross injustice had been done their client. In fact the leading counsel for the plaintiff and appellant made his principal argument upon that contention. He asks this court to now set aside and vacate the order denying a rehearing and recall the remittitur. To do so would be to lay aside for the purpose of this one cause the well-settled rules of finality of this court and upon the plea

of miscarriage of justice by one of the contending parties to wipe out the finality that is provided for every cause that comes to this court, and upon this occasion to set it aside and again open the doors to another contention and another decision which undoubtedly would, no matter whether it would sustain the former decision of this court or otherwise, still leave one party or the other feeling that gross injustice had been done.

Nearly every cause brought before this court has interpreted into the argument made by counsel for contending parties a plea alleging injustice, and usually gross injustice. Were such pleas to be the basis for the determination of this court, undoubtedly most of the litigation brought here for final determination would be long continued, uncertain, and in some cases almost never ending. Such a practice or precedent cannot be established. This being a court of final resort, when it has once acted and made a final determination of a cause and the remittitur sent down in the regular manner as in the case at bar, there would have to be very exceptional reasons, such as do not now suggest themselves, to set aside and vacate a final determination and to bring the issues back into this court.

While we do not believe that this court has any power to reinvest itself with jurisdiction for the purpose of reconsidering the merits of this cause, yet in view of the strenuous contention of plaintiff's counsel that gross injustice has been done to their client by the former decision and that an examination of the record would disclose this fact, we have examined the record at length in order to ascertain the truth with respect to every phase of the application, and we find nothing in the record or in the proceedings of the court as constituted and acting in the month of December, 1916, that would warrant us in setting aside the order denying a rehearing. The examination of the record also leads us to the conclusion that the former decision on the merits of this cause is right and should be permitted to stand, even though the court was possessed of power to reconsider the merits of the cause.

Counsel for plaintiff and appellant in his argument before this court admitted that under the press of other engagements he and his associate counsel had not given the case that attention and consideration in its preparation for the hearing in this tribunal that it should have

had, and asks that we now permit a wide latitude of sympathetic favor to be interpreted into this case.

The matter has been heretofore regularly and finally determined and disposed of. The motion to set aside and vacate the order heretofore made denying the rehearing and recalling the remittitur is denied.

HANLEY (concurring). I concur in the principles of law stated in the syllabus, and in the conclusion announced in the majority opinion.

As I understand the argument of counsel for appellant, they present two questions to the court on this application.

First, they question the right of the court as constituted on December 28th, 1916, to deny a rehearing and transmit the remittitur to the trial court, on the alleged ground that the terms of office of three members of the court as then constituted expired on the 4th day of December, 1916, and therefore the action of the court in denying the rehearing and transmitting the remittitur was a nullity.

Second, the appellant appeals to the discretion of the court as now constituted to consider the case on its merits, in passing upon the application for a rehearing, even if it is conceded that the court as constituted on December 28th, 1916, was a de facto court. And on this question argue, on the merits of the original controversy, that the court, in its original opinion,—Youmans v. Hanna, ante, 479, 160 N. W. 705,—misunderstood the question presented and argued, and that said court at that time did not give the proper consideration to the case, on the alleged grounds that it was advanced on the calendar and hurriedly heard.

As to the first question, the appellant challenges the jurisdiction of the court sitting in State ex rel. Linde v. Robinson, ante, 410, 160 N. W. 512, which was a proceeding in which the court as then constituted issued an order to show cause why the court should not take jurisdiction and determine the question as to when the term of office of the newly elected justices of the supreme court commenced.

I am of the opinion that the petition filed by the attorney general, and which instituted the proceeding, was insufficient in that it did not state facts sufficient to constitute a cause of action in favor of the state and against the justices elect, in this, that the said petition asked the court to exercise its original jurisdiction preventing or restraining Jus-

tices elect Robinson, Grace, and Birdzell from taking office, and, as grounds, alleged, among other things:

"That at the general election held in November, 1916, said Justices Robinson, Grace, and Birdzell received a majority of all the votes cast, and were chosen and elected as justices of the supreme court of this state, to succeed Chief Justice C. J. Fisk and Judge E. T. Burke and Judge E. B. Goss, but that as yet, at this date (the date of the filing of the petition), no official canvass of the vote had been made.

"That under the Constitution and laws of the state of North Dakota, and the custom prevailing in the state, the terms of office of the justices elect will begin on January 2nd, 1917. That the incumbent justices constitute a majority of the supreme court, and that there is at present before the supreme court a large number of cases which have been argued and submitted and undisposed of because it is generally assumed that the terms of office of their successors begin in January, 1917, and not in December, 1916.

"That there has been brought to the knowledge of the incumbent justices that the three justices elect will claim and contend that their terms of office begin in December, 1916, and that Justice elect Robinson has by letter communicated to the chief justice his contention that the term of office begins in December, and that he will then demand and exercise his right to qualify and take said office. That a letter purporting to have been signed by said Justice elect Robinson has been printed in the Bismarck Tribune and Fargo Forum, and perhaps other papers of the state, setting forth his views in the matter, and that in the Grand Forks Herald of November 28th, 1916, Justice elect Birdzell is quoted as having stated that should a fight be made, he would stick by his colleagues.

"That the said justices elect are each and all threatening to intrude into and assume the office of justices of the supreme court unless restrained from so doing. That by reason of the said matters and proceedings to be taken by the said justices elect, confusion and uncertainty exist as to who is entitled to hold the office; that the state, as plaintiff, is entitled under the Constitution and laws to have a supreme court that shall not unlawfully be hindered, impeded, or interfered with, and that the court should by its original writ prevent the usurpation of office by the justices elect and prevent their intrusion, or

attempted intrusion, into the office, and should assume jurisdiction in the matter and declare which justices are entitled to hold the office during the month of December, and determine as to who is entitled to the salary during that month, and for such other relief as the court might grant."

This petition is based upon letters of one of the justices elect and upon newspaper accounts of what might happen, and there is no allegation in the petition that any steps or acts had been taken or committed by any of the justices elect seeking to take the office by force or threats of force, and to my mind the effect of the petition was to ask the court to anticipate a possible state of facts that might arise and to try the title to the office in a summary manner, and by injunction, and was in effect a petition to try a cause of action before it actually arose.

If the facts presented in the petition were such that it was claimed that the justices elect had offered or attempted to take physical possession of the office and the books and papers, another situation would have been presented.

But as I understand the petition filed in the matter such were not the facts alleged, nor do I understand that the petitioner brought the proceedings within the facts stated in State ex rel. Bolens v. Frear, 148 Wis. 456, L.R.A.1915B, 569, 134 N. W. 686, cited by the court in State ex rel. Linde v. Robinson, supra.

That the petition does not state facts sufficient to state a cause of action also seems to be borne out by the fact that the court as constituted in that case, did not issue an order directed against the three justices elect as petitioned for, but issued an order to show cause against, not only the three justices elect, but the three incumbents, which directed all six of the contesting judges to appear and show cause why the court should not take jurisdiction of the matter and determine the title to the office in a summary manner.

I cannot see the distinction between this and issuing a writ or order to show cause in any case and deciding it in a summary manner where the title to office is in alleged dispute, and it seems to me that a dangerous precedent has been established in this matter.

I, as district judge, sitting on the court, concurred in the issuance of the order to show cause to all six of the justices, not on the ground that the court had a sufficient proceeding before it, but upon the ground

35 N. D.—34.

that in the controversy that had arisen between the contending parties a court should be offered to the contending justices in which they could settle the difficulty. State ex rel. Linde v. Robinson, ante, 410, 160 N. W. 512. When the justice elect filed written objections and took the position that the court had no jurisdiction in the matter, I, for the reasons stated, did not act further in the proceedings. However, the remainder of the court held that the court did have jurisdiction of the subject-matter and of the parties, and in State ex rel. Linde v. Robinson, ante, 417, 160 N. W. 514, held that the term of office of the judges of the supreme court commenced in January, and not in December. The reasoning of that decision, and particularly the portion of it which holds that it has been the implied construction since statehood that the term begins in January, and not in December, is difficult to follow. This is particularly so in view of the fact that at least two of the retiring judges whose terms were involved in that decision took their oath of office in December when first elected, and made formal demand for the possession of the office that month. In justice to them, however, it should be said that they made such demand in order to protect their rights in case a controversy arose, rather than to compel the possession of the office. I am requested by Judge Cole, sitting in this case, to state that he also questions the reasoning of the court as constituted in State ex rel. Linde v. Robinson, ante, 417, 160 N. W. 514, in which it held that the term begins in January, rather than in December. I am satisfied, however, that when the court handed down this opinion, it became the law of the case and settles the question as to the time of commencement of the terms of office of judge of the supreme court in this state.

. That decision of the court was acquiesced in, and during the month of December, 1916, the three retiring judges continued to sit on the court and transact its business, and during that time constituted the only supreme court of the state that transacted business. The old court was recognized as the supreme court during that month, and certainly was at least a *de facto* court during the time when the petition for rehearing in the instant case was denied, and the supreme court of this state having heard and decided on the merits the instant case prior to the first Monday in December, 1916, when its right to act was unquestioned, and having denied a rehearing in the matter on December 28th,

1916, when it was the only acting supreme court of the state, and at least a *de facto* court, and having at said time intentionally transmitted the remittitur to the lower court, I am satisfied that, under the law and the decisions, the case is ended, and for the reasons expressed in the majority opinion, this court cannot now and again consider a petition for rehearing.

In determining the question as to whether or not the remittitur which finally terminated the instant case was properly sent down or transmitted to the lower court, each one of the court as now constituted has gone through the record from its inception, and in view of the fact that the counsel have argued so strenuously that an injustice was done on the merits of this case, it may be proper to make a statement of what the facts in the case are.

I am satisfied that the record shows that the original opinion of the court on the merits was correct, and certainly such opinion shows that the court went carefully into the whole record, even though it is argued that the case was hurried to a decision.

The testimony of the plaintiff, Youmans, discloses that he and his wife held the great majority of the stock of the bank involved in this action, and that he also owned a great majority of the stock of the Savings & Trust Company operated by him in the same building. That in the assets of the bank was a large amount of paper which was not bankable, and objection being made to this paper by the bank examiner and banking board of a previous state administration, he in the space of one or two days collected a number of strangers in Minot, and by arrangement with them, and for no adequate consideration, conveyed to these different strangers a number of quarter sections of farm land already mortgaged, belonging to him or to the loan company, and took back from these strangers notes and mortgages on the land, and then had the strangers redeed the land to him or his loan company, which deeds he kept in his possession unrecorded. He then took these notes and mortgages to the amount of over $50,000 and put them in the bank as assets, and the credit therefrom was used by him or his loan company. The effect of the transaction was the placing of mere paper assets in the bank to that extent, and which added not a dollar to the market value of the assets of the bank or himself or the loan company. The effect of the transaction was a loan by the bank

to himself or his loan company of over $50,000, and this, in direct conflict with § 5172 of the Compiled Laws 1913, which limits the liability of any one person or corporation to a bank at 15 per cent of the capital and surplus stock of such bank.

The plaintiff admits these transactions, but claims it was a "banker's trick" and that "they all do it."

The transaction was not only "high financing," but under the provisions of the Code, § 5173 of the Compiled Laws 1913, enacted for the protection of depositors in banks, was an offense for which the plaintiff could have been prosecuted in court.

These mortgages also represented on their face that they were first mortgages, when as a matter of fact there were other and outstanding prior mortgages on the different tracts of land to the full loan value thereof, and, if these second mortgages were represented as first mortgages, and if exhibited to the bank examiner with intent to deceive, that act would be a criminal offense under the laws of this state (Comp. Laws 1913, § 5174).

In disregard of many orders of the banking board a large amount of this paper remained in the bank at the time it was closed by the bank examiner.   Under the laws of this state a bank under such conditions is deemed insolvent (Comp. Laws 1913, § 5189), and under such conditions the banking board has authority to close the bank, and it becomes the duty of the banking board to forthwith take possession of any bank becoming insolvent, or which violates the provisions of the Banking Laws (Comp. Laws § 5183).

The banking laws of this state provide that no bank shall carry among its assets at any one time loans dependent wholly upon real estate security in any amount exceeding 25 per cent of the total loans and discounts, and then only upon first mortgages, which shall not exceed 40 per cent of the actual cash value of the property mortgaged. Comp. Laws 1913 § 5150, ¶ 8.   The record in this case discloses that at the time the bank was closed more than one half of the assets of the bank consisted of loans dependent wholly upon real estate, which was in violation of the provisions of the law which has for its purpose the conservation of the assets of a bank for the protection of its depositors.

Under these facts the bank examiner closed the bank, and there was

no contention at that time by the plaintiff that the bank was solvent under the law; but he claims that the bank examiner demanded that he deposit more cash in the banks as assets than was necessary to make the bank solvent, and that the bank was taken away from him as a result of a conspiracy by the defendants to deprive him of his property. If at the time the plaintiff believed that the amount demanded was too much, he had his recourse in the courts by an action for a restraining order to prevent such demand, and in that proceeding the exact amount required to make the bank solvent could be determined. Instead of doing this he negotiated for the sale and disposal of the bank, and sold the same to the defendants, Barron, Byorum, Johnson, and Rasmussen, who are not connected with the banking board, on condition that they should make the bank solvent and protect the depositors, and relieve the plaintiff of all liability in the matter. This the defendants mentioned agreed to do on the transfer of the bank to them, and the giving to them of a note and mortgage in the sum of $5,000 by the plaintiff, which was the amount of the plaintiff's individual indebtedness to the bank.

The transfer papers in this transaction were made by the plaintiff himself. No action has been started by him to set the transfer aside, and his offer of proof discloses that if he had desired to he could have opened the bank and not transferred it, as he was offered sufficient funds by his friends, to place in the bank as assets to the amount required by the examiner and the banking board. Nor was the transfer without consideration to the plaintiff, as by its terms he relieved himself of the liability fixed by statute (§ 5168, of the Compiled Laws), under which his property in the loan company, and other property, would have been liable for the debts of the bank.

Counsel complain of the manner in which the bank examiner took possession of the bank and its assets, claiming that he arbitrarily excluded the plaintiff from access to the bank.

Under the law the bank examiner has the authority, and it is his duty, under the direction of the banking board to "forthwith take charge of an insolvent bank." Comp. Laws 1913, § 5183. And the object of this statute is undoubtedly to place the assets of an insolvent bank completely in the hands of a bonded officer of the state, to the exclusion of all persons, even the officers of the bank, to the end that

the assets remain intact. It is true that the statute contemplates that the assets be held pending action in court and the appointment of a receiver, but such action became unnecessary, as the plaintiff, as before stated, transferred the bank to purchasers who, under the banking laws, deposited assets enough to make the bank solvent and agreed to protect the depositors and relieve the plaintiff of further liability.

The errors complained of in the trial court are largely alleged errors in receiving or rejecting evidence.

In my opinion such errors, if any, are nonprejudicial, and could not affect the final decision in the case, for the reason that, under the plaintiff's own testimony, he failed to show a cause of action, and established the fact that, under the facts testified to by him, it would be impossible to recover on the theory that a conspiracy existed under which the bank was closed and taken from him.

The trial court was right in directing a verdict for the defendants.

The petition of the appellant for a rehearing in this matter should be denied.

ROBINSON, J. (dissenting). In the Grant Youmans Case a motion to reconsider and grant a new trial is denied, and I do most strenuously dissent. The decision is a lengthy write-up by two judges of an inferior court, and is contrary to the deliberate judgment of a majority of our justices. Hence, it is not the judgment of this court, but while it stands it will stand as a reproach to this court. Hence, it will still be the duty of this court, on its own motion, or on any proper motion, to reconsider the case and to order a new trial.

The case is a travesty on the administration of justice. It is a regular Captain Dreyfus Case. The record covers over nine hundred pages, and there is error on every page. The defendants have, as it were, moved Heaven and earth to prevent a fair trial, or any trial, and that alone shows they have reason to fear the result of a fair trial.

At Minot the plaintiff was a banker. He and his wife practically owned and controlled a bank of large resources, though of questionable solvency, a bank out of which it seems the looters made big money. The bank examiner, with others of the defendants, came upon the plaintiff and forcefully closed the bank, taking all its property and the property of the plaintiff and his wife, and a bonus of $5,000.

Youmans testifies:

The bank examiner came to me with a bunch of papers in his hand. He placed me in a chair and told me to sit down there. He took hold of the chair and, said, *"Sit down there."*

Q. Did you?

A. Yes, sir.

The bank examiner objected to certain mortgages, amounting to $20,000, and gave Youmans a day to replace the loans with cash. This Youmans prepared to do. Then the examiner put up the figure to $48,000. Youmans said: "My God! You don't mean that." The answer was: "That is the amount you will have to put up to save the bank." "Then I sat down into a chair and became partly unconscious. It put me to sleep practically." The whole procedure was of that same bulldozing character. The examiner and his bunch forced Youmans to turn over to them the bank and all its books and his stock in the bank, with a bonus of $5,000. This was done by duress and threats, and by taking an unfair advantage of another's necessities and distress, contrary to the plain words of the statute. This bulldozing procedure had no authority in law. It matters not whether Youmans was a good man or a bad man, or whether his bank was solvent or insolvent; there was no law to warrant the procedure. In taking charge of the bank the examiner was acting under a statutory power, and he was bound to keep strictly within the limits of his power and to use it humanely, and not oppressively. *This he did not do.*

The record is a mass of error. It shows that from the beginning to the end of the case the rulings of the trial court were in the main decidedly against the plaintiff. Five hundred times the court ruled erroneously to strike out testimony of the plaintiff as not responsive or as a voluntary statement, just as though the witness were not sworn to tell the whole truth, and not merely to answer such questions as counsel might put to him. Youmans testifies: "The whole bunch, the examiner and others, refused to let me have the assets of the bank or a list of them. They absolutely refused to let me have access to the stuff. They had gobbled it and they never let me put my hands or my eyes on it after that." (Purcell): "I move to strike out the answer as not responsive and as a voluntary statement and absolutely false." "The

word false is withdrawn and the answer stricken out." And so the trial continued for ten days, with error upon error, making a record of over, nine hundred pages. The trial should have been concluded in two days, with a record of not more than two hundred pages. The testimony should have been limited to the condition of the bank when it was taken over, the property taken by the defendants, the manner of taking it and disposing of it, and the value of the property and the stock and the assets. And on these points evidence was persistently offered and as persistently objected to and excluded. And for such persistence the plaintiff was repeatedly threatened with contempt.

There was nothing to warrant the closing and the wrecking of the bank in the way it was done. Hence, all who took an active part in the wrecking were tort feasors. This includes only those who were present, aiding or abetting or profiting by the wrecking. There was no sense or reason for making any other person a party to the action.

The plaintiff sued for $50,000 damages. The case was tried before Judge Kneeshaw, who directed a verdict for the defendants. On the trial the plaintiff was represented by an attorney who knew more of socialism than of law and practice. He was completely outgeneraled by four shrewd old-time lawyers who opposed him. We call them the Big Four. In the story of Don Quixote we read how his squire, Sancho Panza, was tossed up in a blanket by some humorous rascals. And so it was on the trial of this case. The Big Four restrained their laughter while they dealt with our Socialist friend as if he were a second Sancho Panza. Of course, in a way, it was all very humorous, but it was trifling with the due administration of justice, and for that the big counsel do well deserve a severe rebuke. To every question there was an objection by one, two, three, or more of the big counsel, and the ruling was nearly always against the plaintiff. To the simple question: "How long have you been in the banking business?" there was an objection covering a page and a half.

To cap the climax, the court directed a verdict in favor of the defendants. An appeal to this court was filed on September 21st, 1916, and in some way it was rushed and advanced over a hundred pending appeals, and contrary to the rules of the court and the uniform practice. I never heard of anything like it. And without waiting for the filing of briefs, or the hearing of oral arguments, on December

28th, 1916, a final decision was given against Youmans. To say the least, it was given by a court of very questionable jurisdiction. Three of the judges were holding over after their term of office had expired and after their successors had been duly elected and qualified, and demanded the office. The holding-over judges improvised a court of four district judges to sanction their holding, and this they attempted to do contrary to mandate of the supreme court signed by the three newly elected and qualified supreme court judges. That was on December 5th, and long prior to the decision of the hold-over judges.

Now, under the Constitution, every supreme court judge has been elected to hold office for a term of years, commencing on the first Monday of December after his election. To the several judges there have been issued, pursuant to law, in all, twenty certificates of election, signed by the governor, the secretary of state and a member of the board of canvassers, and given under the great seal of the state. Each certificate shows that the person therein named was elected to the office for a stated term of years, commencing on the first Monday of December after his election. Of course, we cannot think that the twenty great seals and sixty official signatures were given to a falsehood, or that every judge was so simple as to accept his certificate with a false statement.

I concede that on December 28th, 1916, the hold-over judges were *de facto* judges, in just the same sense as they would be were they holding over until the present time.

Early in January, 1917, a motion was made to this court to reconsider the case and to grant a new trial. As Judges Grace and Birdzell declined to sit on the motion, two district judges were invited to take their place. When the motion was argued, the big counsel for the defendant talked of *de facto* courts and judges, and declined to say a word on the merits of the case. One of the district judges followed in the same line and wrote an opinion of some fifteen pages on *de facto* courts. The decision or write-up comes in its usual course after a lapse of two months, which is very different from the way in which the case was rushed and decided without any brief or argument in December.

I am entirely clear the ruling is radically wrong, and it is contrary to the avowed and deliberate judgment of three of the supreme court judges. On another motion, it is more than possible that the judges

of this court may reconsider and decide the case on its merits. Indeed, it is their bounden duty to do it on their own motion. It is a debt of justice and sooner or later it must be paid.